896 So.2d 584 (2004)
Charles Gregory CLARK
v.
STATE.
CR-99-1062.
Court of Criminal Appeals of Alabama.
December 1, 2000.
Opinion on Return to Remand and Overruling of Rehearing June 27, 2003.
Certiorari Denied October 1, 2004.
*595 Stephen A. Strickland, Birmingham, for appellant.
William H. Pryor, Jr., atty. gen., and James R. Houts, asst. atty. gen., for appellee.
William H. Pryor, Jr., atty. gen., and James R. Houts and Anne C. Adams, asst. attys. gen., for appellee (on remand).
Alabama Supreme Court 1021773.
FRY, Judge.
The appellant, Charles Gregory Clark, was convicted of murder committed during a robbery in the first degree, see § 13A-5-40(a)(2), Ala.Code 1975. He was sentenced to death by electrocution.
Our review of the record indicates that the trial court did not comply with the requirements of § 13A-5-47(d), Ala.Code 1975, which states:
"Based upon the evidence presented at trial, the evidence presented during the sentence hearing, and the pre-sentence investigation report and any evidence submitted in connection with it, the trial court shall enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstance enumerated in Section 13A-5-51, and any additional mitigating circumstances offered pursuant to Section 13A-5-52. The trial court shall also enter written findings of facts summarizing the crime and the defendant's participation in it."
(Emphasis added.)
The record reveals that in its sentencing order the trial court omitted certain written findings, as required by § 13A-5-47(d). The sentencing order does not contain findings of fact and does not state specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975. "`Without knowing what the trial judge did, we are unable to properly review his sentencing decision.'" Coral v. State, 585 So.2d 248, 248-49 (Ala.Crim.App.1991), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994), quoting Ex parte Cochran, 500 So.2d 1179, 1187 (Ala.1985).
Because we must remand this case for the trial court to enter specific written findings of fact, we request that the trial court correct any additional errors, although they may be considered harmless, in its sentencing order.
We recognize that the omission of specific written findings concerning the existence or nonexistence of each aggravating circumstance may be harmless error. Stewart v. State, 730 So.2d 1203, 1219 (Ala.Crim.App.1996), aff'd, 730 So.2d 1246 (Ala.1999), cert. denied, 528 U.S. 846, 120 S.Ct. 119, 145 L.Ed.2d 101 (1999), citing Fortenberry v. State, 545 So.2d 129, 144 (Ala.Crim.App.1988). However, we direct the trial court to make specific written findings concerning the existence or nonexistence of each aggravating circumstance.
Moreover, we note that in determining that the capital offense was especially heinous, atrocious, or cruel as compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975, the trial court based its decision that this aggravating *596 circumstance existed in part on the "status and person of the victim".
"`In Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), this Court held that the standard applicable to the "especially heinous, atrocious, or cruel" aggravating circumstance under § 13A-5-49(8) is that for a crime to fit within that section it must be one of "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim."
"`....
"`This Court has decided upon an approach for the purposes of § 13A-5-49(8). In comparing capital offenses for the purposes of determining whether a capital offense was "especially heinous, atrocious or cruel," the court uses the Kyzer standard. Capital offenses failing under § 13A-5-49(8) are pursuant to the Kyzer standard, those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim." Kyzer, 399 So.2d at 334.'
"Ex parte Bankhead, 585 So.2d 112, 124-125 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993)."
Hutcherson v. State, 727 So.2d 846, 859 (Ala.Crim.App.1997), aff'd, 727 So.2d 861 (Ala.1998), cert. denied, 527 U.S. 1024, 119 S.Ct. 2371, 144 L.Ed.2d 775 (1999). Factors indicative of an offense's being "especially heinous, atrocious, or cruel" include, but are not limited to, whether the infliction on the victim of physical violence was beyond that necessary to cause death, whether a victim experienced appreciable suffering after a swift assault that ultimately resulted in death, whether the victim suffered psychological torture. Norris v. State, 793 So.2d 847 (Ala.Crim.App.1999). In Norris, the Court emphasized that "the period of suffering must be prolonged enough to separate the crime from `ordinary' murders for which the death penalty is not appropriate." 793 So.2d at 861.
We are concerned that the trial court's basing the finding in part on the "status and person of the victim" and not solely on the circumstances of the murder may exceed the narrow interpretation of this aggravating circumstance that was adopted in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), and that its judgment would not withstand the years of appellate review given a case in which the sentence is death. We do not mean to be understood as saying that the trial court's finding that the offense was especially heinous, atrocious, or cruel as compared to other capital offenses cannot be supported by the record. However, as we stated in Norris, "it is imperative that we continue to use a `consistent and narrow interpretation' of this aggravating circumstance" in order to maintain the constitutionality of its application. 793 So.2d at 853. See also Ex parte Clark, 728 So.2d 1126 (Ala.1998). Therefore, we direct the trial court to consider only the narrow interpretation defining "especially heinous, atrocious or cruel" to include only "those conscienceless or pitiless homicides which are unnecessarily torturous to the victim" as mandated by Ex parte Kyzer, when determining the existence or nonexistence of this aggravating circumstance.
Furthermore, we note that, when analyzing the mitigating circumstances, the trial court stated that the statutory mitigating circumstance that Clark had "no significant history of prior criminal activity" did not exist. In support of its determination, the trial court indicated that Clark had a prior conviction for possession of a controlled substance, and that he had been arrested for several other offenses. "`[O]nly convictions can be used *597 to negate the statutory mitigating circumstance of no significant history of prior criminal activity.'" Parker v. State, 587 So.2d 1072, 1098 (Ala.Crim.App.1991), aff'd, 610 So.2d 1181 (Ala.1992), cert. denied, 509 U.S. 929, 113 S.Ct. 3053, 125 L.Ed.2d 737 (1993), quoting Hallford v. State, 548 So.2d 526, 544 (Ala.Crim.App.1988). See also Apicella v. State, 809 So.2d 841, 863 (Ala.Crim.App.2000). We recognize that, without regard to Clark's prior arrests, the evidence of Clark's felony conviction for possession of a controlled substance precludes the trial court from finding that he had "no significant history of prior criminal activity." Thus, the consideration of Clark's prior arrests by the trial court may be considered harmless. See Ex parte Davis, 718 So.2d 1166, 1178 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999)(trial court's consideration of prior juvenile adjudications held harmless where defendant had a prior felony conviction for robbery as an adult); Madison v. State, 718 So.2d 90, 98 (Ala.Crim.App.1997), aff'd, 718 So.2d 104 (Ala.1998), cert. denied, 525 U.S. 1006, 119 S.Ct. 521, 142 L.Ed.2d 432 (1998)(trial court's consideration of prior juvenile adjudications held harmless where defendant had history of prior felony convictions as an adult). However, because remand is required, we recommend that, in its revised sentencing order, the trial court correct this discrepancy.
Due to the deficiencies in the sentencing order, we remand this cause with directions that the trial court enter written findings of facts summarizing the offense and Clark's participation in it. Additionally, the trial court should enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, each mitigating circumstance enumerated in § 13A-5-51, and any additional nonstatutory mitigating circumstances offered pursuant to § 13A-5-52, and, once again, decide the appropriate punishment by reweighing the aggravating circumstances against any mitigating circumstances. No new sentencing hearing is required. However, the trial court is granted the authority to resentence Clark in the event the trial court determines that death is not the appropriate sentence. See Parker v. State, supra. A return should be made to this Court within 35 days from the date of this opinion.
REMANDED WITH INSTRUCTIONS.
LONG, P.J., and McMILLAN and COBB, JJ., concur; BASCHAB, J., recuses herself.

On Return to Remand and On Application for Rehearing
SHAW, Judge.[1]
The opinion of February 28, 2003, is withdrawn and the following opinion is substituted therefor.
Charles Gregory Clark was convicted of murder made capital because it was committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala.Code 1975. By a vote of 11-1, the jury recommended that Clark be sentenced to death. The trial court accepted the jury's recommendation and sentenced Clark to death. On December 1, 2000, this Court remanded this case to the trial court for it to correct several deficiencies in its sentencing order. See Clark v. State, 896 So.2d 584 (Ala.Crim.App.2000). The trial *598 court has complied with our instructions and, on return to remand, has submitted an amended sentencing order to this Court that complies with § 13A-5-47(d), Ala.Code 1975.
The evidence adduced at trial indicated the following. On the evening of February 13, 1998, Clark went to the apartment of his girlfriend, Rhonda Kenny, in Pensacola, Florida. Kenny testified that Clark had driven to her apartment that evening at approximately 8:00 p.m. in his stepfather's pickup truck. When Clark arrived, Kenny said, he was "high" on crack cocaine. Kenny testified that, at that time, she and Clark had known each other for approximately a year and that they had often smoked crack cocaine together. According to Kenny, both she and Clark were employed and they both used their income to purchase crack cocaine. In addition, Kenny said, Clark often pawned his property and property belonging to his parents to obtain money to purchase crack cocaine. Approximately one week before February 13, 1998, Kenny said, Clark received an income-tax refund of $2,800; Kenny stated that Clark used the entire amount to purchase crack cocaine. At some point during the evening of February 13, 1998, Kenny said, Clark left her apartment and then later returned. Kenny testified that when Clark returned he was walking and he told her that the truck had run out of gas and that he had walked back to her apartment. Kenny stated that she and Clark stayed up all night smoking crack cocaine and that Clark was "high" when he left her apartment at approximately 5:00 a.m. on February 14, 1998, driving her Toyota Celica automobile. Kenny testified that she did not think that Clark was able to drive safely, but that she gave him the keys to her car anyway. Just before Clark left her apartment, Kenny said, he borrowed $40 from her brother-in-law, which, she said, Clark promised to pay back the next day. Despite having borrowed $40, Clark told Kenny that he was going to drive to Seminole to borrow more money. Kenny testified that she did not see Clark carrying a knife that morning and that she had never known Clark to carry a knife.
James E. Iles testified that on February 14, 1998, at approximately 7:20 a.m., he was driving on Fort Morgan Road in Baldwin County on his way to go fishing when he passed a gasoline station/convenience store owned and operated by William Fuller Ewing. Iles stated that he noticed two people outside the store; he said that one person was on his hands and knees in the parking lot and the other was walking toward a car parked at the gasoline pumps. As he passed the store, Iles said, he saw one of the men get into the car near the pumps and drive away in the same direction Iles was traveling. Iles testified that he decided to turn around and go back to the store to see what was happening. When he turned around and started back toward the store, Iles passed the car that had been parked near the gas pumps. At that point, Iles said, he changed his mind about going back to the store, and, instead decided to follow the car that had been at the store in order to identify it. Iles turned around again and followed the car. Iles got the license tag number of the car and then pulled into another gas station/convenience store and telephoned emergency 911.
At approximately 7:45 a.m., Huey Mack, Jr., chief investigator for the Baldwin County Sheriff's Department, received a dispatch to go to Ewing's store on Fort Morgan Road. When he arrived at the scene, Investigator Mack said, he saw Ewing's body on the ground in the doorway to the store; he stated that Ewing was positioned so that his feet were toward the gas pumps in front of the store and his head and chest were on the threshold of the *599 door. Ewing had been stabbed numerous times. Over $600 in cash was found in Ewing's billfold in his pants pocket. Investigator Mack testified that Ewing's body was covered in blood and that blood on the ground extended approximately six feet outside the store and six feet inside the store. In addition, several droplets of blood were found on the check-out counter and on the floor behind the check-out counter. Investigator Mack also discovered a pack of cigarettes with a clump of what appeared to be bloody hair around it and a baseball-style cap on the floor in the entrance to the attendant's area behind the check-out counter. A stick was also found standing on end against the wall in the corner behind the counter. The cash register was on the floor in front of the check-out counter and there were loose coins on the floor and on the counter. The cash-register tape indicated that the last transaction rung up on the register was the previous evening, February 13, 1998, at 8:52 p.m. One of the gasoline pumps in front of the store was on and the hose and nozzle of the pump were lying on the ground; that same pump indicated that approximately $14 in gas had been pumped from it. In addition, a shoe print was discovered near the gas pumps.
Dr. Leroy Riddick, a medical examiner with the Alabama Department of Forensic Sciences who was accepted by the trial court as an expert in forensic pathology, performed the autopsy on Ewing. Dr. Riddick testified that Ewing suffered 15 stab wounds, 17 superficial cuts, and several scrapes on his body, including on his back, his chest, his face, his arms, and his hands. Dr. Riddick stated that the wounds were most likely caused by a knife and that, because of the presence and amount of blood in each wound, in Dr. Riddick's opinion, Ewing was alive when each wound had been inflicted; however, Dr. Riddick said that he could not determine the order in which the wounds had been inflicted. According to Dr. Riddick, the two stab wounds in the back were relatively deep wounds  they, in fact, struck bone  and "would take some degree of force." (R. 800.) In addition, Dr. Riddick stated that one of the stab wounds to the chest punctured Ewing's heart. Dr. Riddick testified that the wound to the heart would have been fatal within a few minutes. Dr. Riddick also stated that there were a few wounds on Ewing's hands and arms which he described as defensive wounds; however, Dr. Riddick stated that the lack of a significant number of defensive wounds on Ewing's hands and arms indicated that Ewing and the perpetrator were in very close proximity  i.e., closer than two feet  struggling at the time of the stabbing.
William Bentley Cowan, a corporal with the Gulf Shores Police Department, testified that on the morning of February 14, 1998, he was informed by the police-department dispatcher about a possible assault or homicide at a gas station on Fort Morgan Road. Cpl. Cowan then drove to Fort Morgan Road in an attempt to find the gas station. He stopped at the first gas station he saw  Mo's Landing, which is approximately 8 to 10 miles away from Ewing's store. At Mo's Landing, Cpl. Cowan was informed that a silver Toyota Celica automobile that had just driven past Mo's Landing was involved in the incident at Ewing's store. Cpl. Cowan reported the automobile and then drove east on Fort Morgan Road in an attempt to find it. Cpl. Cowan testified that, as he was looking for the car, he heard over the radio that another officer with the Gulf Shores Police Department, Justin Clopton, had stopped a vehicle matching the description. Cpl. Cowan then went to assist Officer Clopton.
Both Cpl. Cowan and Officer Clopton identified Clark as the driver of the silver *600 Toyota Celica automobile that Officer Clopton had stopped. Cpl. Cowan testified that Clark had a "fairly large amount" of blood on his hands, his neck, and his clothes, particularly his jeans, but that he did not see any cuts or wounds on Clark. (R. 777.) In addition, Clark had a bald spot near the crown of his head where it appeared that his hair had been pulled out. Officer Clopton stated that when he asked Clark where the blood on his clothes had come from, Clark said that he had gotten "in a scuffle... with a guy down the road" and that he had gotten a "scratch on his neck." (R. 896-97.) Cpl. Cowan stated that he saw a ski mask and a copy of the Mobile Register newspaper on the front passenger's side floorboard of the car and a "large wad of cash" stuck between the two front seats. (R. 781.) The ski mask was on top of the newspaper. No drugs or drug paraphernalia were found in the vehicle. Cpl. Cowan and Officer Clopton decided to detain Clark and they placed him in handcuffs and seated him in the back of Officer Clopton's patrol car. Both Cpl. Cowan and Officer Clopton testified that Clark responded to their directions and that he did not appear intoxicated. Officer Clopton also testified that, when he initially stopped Clark, Clark appeared nervous.
Michael Cook, who was an investigator with the Baldwin County Sheriff's Department in 1998, testified that on the morning of February 14, 1998, he was dispatched to Ewing's store on Fort Morgan Road. On his way to the store, Investigator Cook was told that a vehicle had been stopped in connection with the crime at the store, and he was instructed to go to where the vehicle was stopped rather than to the store. Investigator Cook said that when he arrived at the scene Clark was in the back of Officer Clopton's patrol car. When he spoke with Clark, Investigator Cook said, Clark appeared "a little nervous," but he did not seem intoxicated. (R. 910.) Investigator Cook asked Clark if he could look in the vehicle and Clark told him that he could. Investigator Cook collected from the vehicle the money that was stuck between the two front seats, which totaled $397, and the newspaper and mask that were on the floorboard of the front passenger's side. The date on the newspaper was February 14, 1998. In addition, Investigator Cook took numerous photographs of the vehicle. One photograph, depicting the gas gauge in the dashboard of the car, showed that the Toyota had a full tank of gas. Another photograph showed that the door to the gas tank was open.
Clark was arrested and transported to the Gulf Shores Police Department. At the department, Clark was interviewed by Investigator Cook and Sergeant John Stewart, also with the Baldwin County Sheriff's Department. Sgt. Stewart read Clark his Miranda[2] rights; Clark indicated that he understood those rights and then signed a waiver-of-rights form. Sgt. Stewart and Investigator Cook both testified that Clark was never threatened and that he was never promised any reward for making a statement. In addition, both Sgt. Stewart and Investigator Cook testified that Clark did not appear to be under the influence of alcohol or narcotics at the time of the interview. Sgt. Stewart and Investigator Cook initially spoke with Clark for approximately 20 minutes; during that interview, Clark explained his version of what had happened at Ewing's store. In that initial statement, Clark indicated that he had wiped the blade of the knife he had used to stab Ewing on his pants. After the initial statement, Sgt. Stewart turned on a tape recorder, reread Clark his Miranda rights, and asked Clark to again explain his version of events. *601 Clark then gave a tape-recorded statement.
In the tape-recorded statement, Clark admitted to stabbing Ewing, but he maintained that he did so only because Ewing had attacked him. He also admitted to taking a money bag from Ewing, but he claimed that he had no intent to rob Ewing until after he had stabbed him. Clark stated that the day before the crime, February 13, 1998, he had spent the entire day in Pensacola, Florida, smoking crack cocaine. According to Clark, he had pawned items belonging to his stepfather and had also borrowed money to pay for the crack cocaine he had purchased and smoked that day. Sometime during the evening of February 13, 1998, Clark said, his stepfather's truck had run out of gas and he had walked to Rhonda Kenny's apartment. Early the next morning, February 14, 1998, he had asked Kenny if he could borrow her car to drive to Seminole and she had agreed. Clark said that he left Kenny's apartment about 4:45 a.m. and went to a house he owned in Seminole to pick up his mail. After he got his mail, Clark said, he began driving back to Pensacola. However, Clark stated that on the way, he decided to stop by a beach house owned by his mother and stepfather on Fort Morgan Road. When he got ready to leave the beach house, Clark said, he noticed that the car was low on gas, so he stopped at the nearest gas station  Ewing's store. Clark said that he had known Ewing for about 10 years.
Clark stated that when he first arrived, Ewing was not yet at the store. Ewing arrived approximately 15 minutes later, Clark said, and he asked Ewing to turn on the gas pumps. According to Clark, after the pumps were turned on, he put the nozzle in his car and set it on automatic; he then went inside the store and spoke with Ewing. Clark said that he asked Ewing for a pack of cigarettes and that, as soon as Ewing got them and laid them on the counter, the gas pump stopped. Ewing told Clark that he owed approximately $14 for the gas. Clark stated that he paid for the gas and cigarettes and received change. It was at that point, Clark said, that he saw Ewing's money bag lying on the open drawer of the cash register. Clark said that he stayed and chatted with Ewing for approximately five minutes. When he turned to leave the store, Clark said, Ewing asked him if he was going to pay for his gas. According to Clark, he told Ewing that he had already paid for the gas, but Ewing said that he was going to call the sheriff's department and came around from behind the counter and approached him.
Clark said that he and Ewing then "tussled, back and forth a little bit, just pushing and shoving." At that point, Clark said, Ewing walked back behind the counter, got a stick, and came to the front of the counter. According to Clark, he had a hunting-type knife in the pocket of the jacket he was wearing[3] and, when Ewing drew the stick back as if to hit him (but before he actually did hit him), he pulled out the knife and "started sticking him and cutting." They then fell to the floor struggling, and Clark continued to stab Ewing. When this initial struggle stopped, Clark said, Ewing went behind the counter and leaned over. Clark stated that he thought Ewing was getting a gun, so he jumped on Ewing and began stabbing him again. He and Ewing continued to struggle and they *602 again ended up in front of the counter. Eventually, Clark said, he was able to get away from Ewing and leave the store; however, Ewing followed him outside and another struggle ensued. Clark stated that this struggle lasted for "just a minute" because he stabbed Ewing one or two more times and Ewing then fell to the ground and quit fighting him. Clark said that he then walked to his car to leave, but that, when he was almost to his car, he remembered the money bag he had seen lying on the drawer of the cash register and he decided he wanted the money so he could buy more crack cocaine; he then went back into the store and got the money bag. According to Clark, when he went back into the store to get the money bag, Ewing was on the ground about halfway between the gas pumps and the front door to the store. When he came out of the store with the money bag, Clark said, Ewing was still in the same area, but he was attempting to get up and make it to the door of the store. Clark walked past Ewing on his way to the car, took the gas nozzle out of the car, laid it on the ground, and got in the car to leave. At that point, Clark said, he saw that Ewing was near the front door of the store on one knee struggling to get off the ground to open the door.
Clark stated that he then left the scene. As he was driving away, Clark said, he threw the knife he had used to stab Ewing out of the car window. Shortly after disposing of the knife, he saw a garbage can on the side of the road, and he stopped and threw away the money bag. A short time after he got rid of the money bag, Clark said, he was stopped by a Gulf Shores police officer.
Throughout his statement, Clark maintained that he had had no intent to rob Ewing, that he merely remembered the money bag after the stabbing, and that he had decided he could use the money to buy more crack cocaine. He also maintained that the only reason he had stabbed Ewing the first time was because he thought Ewing was going to hit him with the stick and that he had jumped on Ewing and had stabbed him again when Ewing was behind the counter only because he thought Ewing was getting a gun. Clark stated that during the struggle with Ewing, Ewing had hit him several times and had also pulled his hair.
Following the interview, Investigator Cook and Sgt. Stewart asked Clark if he would go to Fort Morgan Road with them and show them where he had thrown the knife and the bank bag out of the car. Clark agreed. The bank bag was found in a garbage can on Fort Morgan Road. In the bag was a checkbook belonging to Ewing. Investigator Cook and Sgt. Stewart also found a pocketknife on the side of Fort Morgan Road, although they did not believe it was the murder weapon. The record reflects that local residents found two additional knives on the side of Fort Morgan Road some time after the murder; one was found a mile from Ewing's store. Both of those knives were given to Dr. Riddick to compare with the victim's wounds and were then given to the Department of Forensic Sciences. Dr. Riddick testified that, in his opinion, either or both of the knives could have caused Ewing's injuries. Blood was discovered on both knives, but neither knife had a sufficient amount of blood for DNA testing. Investigator Mack testified that, based on its color and texture, he believed the hair discovered at the crime scene belonged to Clark. In addition, the evidence indicated that the shoeprint discovered near the gas pumps at Ewing's store matched the soles of the shoes Clark was wearing when he was arrested.
Elaine Scott, a forensic biologist with the Alabama Department of Forensic Sciences, *603 testified that she tested several items of evidence involved in this case for the presence of blood. She found blood on the stick that was discovered behind the counter at the store; however, the amount of blood was so little (it was, in fact, not visible to the naked eye) that further testing was not feasible. Scott also found blood on the jeans, the T-shirt, and the boots that Clark was wearing when he was arrested, and on swabs that were taken from Clark's hands and neck. William Harris Jones, also a forensic biologist with the Alabama Department of Forensic Sciences, testified that he did DNA testing on the blood from the jeans and the swabs from Clark's neck and right hand. Jones stated that the blood on the jeans and on Clark's neck was the victim's. In addition, he stated that the blood on Clark's right hand contained DNA from both the victim and from Clark.[4]
Hollis Byrd, Ewing's brother-in-law, testified that he was Ewing's silent partner in the store and that he took care of the business's finances, while Ewing operated the store. According to Byrd, Ewing had been in an accident almost 30 years earlier and had been injured, both physically and mentally. Because of the accident, Ewing was unable to work at a regular job, so Byrd helped him get the store started. According to Byrd, Ewing could not read and write very well and he could not make change very well without the use of the cash register. Byrd testified that Ewing's normal practice when he opened the store in the morning was to put approximately $50 in the cash register and to keep the remainder of the cash for the store in the bank bag behind the counter. In addition, Byrd said, Ewing kept a large amount of his own money in his pants pocket.
Clark pleaded not guilty and not guilty by reason of mental disease or defect. Through his counsel, he asserted three "defenses" at trial: (1) that he was insane at the time of the crime; (2) that he acted in self-defense because, he said, Ewing had attacked him and he had feared for his life; and (3) that, although he killed Ewing and took Ewing's money bag, his crime did not constitute capital murder. As to this third "defense," Clark asserted two arguments. First, he argued that he was not guilty of capital murder because, he said, the taking of the money bag was not part of the killing, but was a mere afterthought. Second, he argued that he was suffering from cocaine intoxication and/or cocaine withdrawal at the time of the crime to the extent that he could not form the intent to kill or the intent to rob. According to Clark, he was in a paranoid state and was responding to a perceived threat from Ewing at the time of the crime.
In support of his defenses, Clark called Marianne Rosenzweig, a clinical psychologist hired to evaluate Clark to determine his mental state at the time of the crime. Dr. Rosenzweig stated that she interviewed Clark; that she examined police reports, witness statements, crime scene findings, and the autopsy report; and that she interviewed several members of Clark's family and employees of the jail where Clark had been housed after the murder. In addition, Dr. Rosenzweig testified that she had experience working with individuals addicted to narcotics, including crack cocaine. According to Dr. Rosenzweig, small doses of crack cocaine initially produce euphoria and increased attentiveness, but as the doses increase and the addiction begins, individuals will experience anxiety, nervousness, irritability, *604 confusion, and paranoia, not only while they are using cocaine, but also during periods of withdrawal. Dr. Rosenzweig further testified that crack cocaine produces a high instantaneously, unlike other forms of cocaine, which take more time to affect the system. She also stated that the high from crack cocaine is more intense than that from other forms of cocaine, but that it abates much more quickly, after approximately 15 minutes. As a result, Dr. Rosenzweig said, crack cocaine is more addictive than other forms of cocaine.
Dr. Rosenzweig testified that her evaluation of Clark revealed that he was addicted to crack cocaine and that he was suffering from paranoia. Dr. Rosenzweig stated that it was her opinion that, at the time of the murder, Clark was suffering from withdrawal, that his judgment was impaired due to paranoia, and that, as a result of his cocaine addiction and paranoia, he did not intend to kill Ewing. However, Dr. Rosenzweig testified that cocaine use and withdrawal would not necessarily prevent an individual from forming the intent to kill. Dr. Rosenzweig also testified that, in her opinion, at the time of the murder, Clark was sane, he knew the difference between right and wrong, and he knew he was committing a crime.
In rebuttal, the State called Robert Anthony DeFranscisco, a clinical forensic psychologist appointed by the court to evaluate Clark. Dr. DeFranscisco testified that, in his opinion, Clark was sane at the time of the murder and that, although Clark was suffering from either cocaine intoxication or cocaine withdrawal at the time of the murder that most likely impaired his judgment to some degree, he believed that Clark "knew what he was doing" at the time of the murder. (R. 1287.) However, Dr. DeFranscisco stated that it would be impossible to know for certain whether Clark was suffering from paranoia to the extent that he perceived a threat from Ewing that was not, in reality, there, and then responded in what Clark believed was self-defense, or if Clark intentionally killed Ewing in order to obtain money to purchase more cocaine to support his addiction.
On appeal, Clark raises 15 issues, most of which he did not raise by objection in the trial court. Because Clark was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice he now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); and Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
"Plain error" has been defined as error "`so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings.'" Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983), quoting United States v. Chaney, 662 F.2d 1148, 1152 (5th Cir.1981). "To rise to the level of plain error, the claimed error must not only seriously affect a defendant's `substantial rights,' but it must also have an unfair prejudicial impact on the jury's deliberations." Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App. *605 1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001). This Court has recognized that "`the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), quoting in turn United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

I.
Clark contends that the trial court erred in conducting a moment of silence at the beginning of his trial. (Issue II in Clark's appellate brief.) He argues that by conducting the moment of silence the trial court improperly injected religion into his trial in violation of the First, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and Art. I, § 3, Alabama Constitution of 1901. Because Clark did not object to the moment of silence, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The record reflects that the following occurred at the beginning of Clark's trial:
"JUDGE REID [presiding circuit judge]: Good morning, ladies and gentlemen. I want to welcome you to this term of Court. As we always do in this Circuit, we begin the opening of Court with the Pledge of Allegiance, followed by a moment of silence. And during that time I would ask you to please consider the very serious business that you will be about during this term of Court.
"The American flag is behind me on the wall of the Court and, if you will, please join me in the Pledge of Allegiance.
"(Whereupon, the Pledge of Allegiance was held.)
"JUDGE REID: I'm joined up here this morning on my right with Judge Lyn Stuart, and on my left by Judge Bob Wilters. Judge Charles Partin is holding a hearing in another courtroom and he'll be along shortly.
"Now, if you will, please join me in a moment of silence.
"(Whereupon, a moment of silence was held.)
"JUDGE REID: Thank you, ladies and gentlemen, and, please, be seated."
(R. 71-72.)
Clark maintains that in Wallace v. Jaffree, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985), "the United States Supreme Court . . . held that the government cannot impose moments of silence because it conveys a message of state approval of prayer activities." (Clark's appellate brief at p. 61.) This, however, is a mischaracterization of the holding in Wallace.
In Wallace, the United States Supreme Court struck down an Alabama statute, § 16-1-20.1, Ala.Code 1975 (repealed), authorizing a "period of silence . . . for meditation or voluntary prayer" at the beginning of each school day in Alabama public schools. Applying the Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), test, the Court found that the statute was enacted "for the sole purpose of expressing the State's endorsement of prayer activities for one minute at the beginning of each schoolday." 472 U.S. at 60, 105 S.Ct. 2479. The Court struck down the statute not, as Clark contends, because a moment of silence by itself violates the First Amendment, but because the Alabama Legislature had effectively amended an already existing statute, § 16-1-20, Ala.Code 1975, which provided for a "period of silence . . . for meditation," solely to add the words "or *606 voluntary prayer." See, e.g., Bown v. Gwinnett County School Dist., 112 F.3d 1464, 1466 (11th Cir.1997)(upholding a Georgia statute providing for a "brief period of quiet reflection" in public schools at the beginning of each schoolday as not violating the First Amendment).
Clark's entire argument regarding the moment of silence is premised on the assumption that a moment of silence is the equivalent of prayer. It is not. As Justice O'Connor noted in her special concurrence in Wallace:
"A state-sponsored moment of silence in the public schools is different from state-sponsored vocal prayer or Bible reading. First, a moment of silence is not inherently religious. Silence, unlike prayer or Bible reading, need not be associated with a religious exercise. Second, a pupil who participates in a moment of silence need not compromise his or her beliefs. During a moment of silence, a student who objects to prayer is left to his or her own thoughts, and is not compelled to listen to the prayers or thoughts of others. For these simple reasons, a moment of silence statute does not stand or fall under the Establishment Clause according to how the Court regards vocal prayer or Bible reading. Scholars and at least one Member of this Court have recognized the distinction and suggested that a moment of silence in public schools would be constitutional. See Abington [School Dist. v. Schempp, 374 U.S. 203] at 281, 83 S.Ct. 1560, 10 L.Ed.2d 844 [(1963)], (Brennan, J., concurring)(`[T]he observance of a moment of reverent silence at the opening of class' may serve `the solely secular purposes of the devotional activities without jeopardizing either the religious liberties of any members of the community or the proper degree of separation between the spheres of religion and government'). . . . As a general matter, I agree. It is difficult to discern a serious threat to religious liberty from a room of silent, thoughtful schoolchildren."
Wallace, 472 U.S. at 72, 105 S.Ct. 2479 (O'Connor, J., concurring). See also Chaudhuri v. Tennessee, 130 F.3d 232, 237-38 (6th Cir.1997), cert. denied, 523 U.S. 1024, 118 S.Ct. 1308, 140 L.Ed.2d 473 (1998)(holding that, under the Lemon test, moments of silence at Tennessee State University functions did not violate the First Amendment because the moments of silence had a secular purpose, "entail[ed] no significant advancement or inhibition of religion," and involved no entanglement of church and state).
In Lemon, the United States Supreme Court set out a three-part test for determining whether a statute violated the establishment-of-religion clause in the First Amendment to the United States Constitution:
"Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster `an excessive government entanglement with religion.' Walz [v. Tax Comm'n, 397 U.S. 664] at 674, 90 S.Ct. 1409, 25 L.Ed.2d 697 [(1970)]."
403 U.S. at 612-13, 91 S.Ct. 2105. Clark maintains that the moment of silence conducted at the beginning of his trial fails the three-part Lemon test. We disagree.
It is clear from the record that the moment of silence had a secular purpose; Judge Reid specifically stated that its purpose was for the jurors to "consider the very serious business" they were about to *607 undertake. (R. 71.) In addition, the moment of silence neither advanced nor inhibited religion; no reasonable observer could conclude that the trial court, by conducting a moment of silence following the recitation of the Pledge of Allegiance, was endorsing or placing its stamp of approval on any particular religion or on religion in general. Finally, the moment of silence did not result in excessive entanglement of church and state; because there is "nothing inherently religious about a moment of silence. . . . [t]he entanglement created by a moment of silence is nil." Chaudhuri, 130 F.3d at 238.
The moment of silence in this case did not, as Clark argues, "inject religion into the trial." (Clark's appellate brief at p. 60.) Both its purpose and its effect were secular. It did not improperly focus the jurors' attention on religion, nor did it suggest that the jurors should use religion in rendering their verdict. Clark was not denied his right to a fair trial by an impartial jury as a result of the moment of silence. We find no error, much less plain error, in the trial court's conducting a moment of silence before the beginning of the trial. See Foster v. State, 639 So.2d 1263 (Miss.1994), cert. denied, 514 U.S. 1019, 115 S.Ct. 1365, 131 L.Ed.2d 221 (1995)(a moment of silence at the beginning of a capital-murder defendant's trial in honor of the troops serving in the Persian Gulf did not violate the First Amendment).

II.
Clark contends that the prosecutor improperly struck prospective jurors on the basis of race and gender in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). (Issue I in Clark's appellate brief.) We address each claim in turn.

Batson Claim
Clark argues that the prosecutor improperly struck prospective jurors D.N., L.B., P.F., J.C., and F.K. solely on the basis of their race.
"`The party alleging racially discriminatory use of peremptory challenges bears the burden of establishing a prima facie case of discrimination. Ex parte Branch, 526 So.2d 609, 622 (Ala.1987). Once a prima facie case has been established, a presumption is created that the peremptory challenges were used to discriminate against black jurors. Id. at 623. Where the prosecutor is required to explain his peremptory strikes, he or she must offer "`a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. However, this showing need not rise to the level of a challenge for cause.'" McLeod v. State, 581 So.2d 1144, 1155 (Ala.Crim.App.1990), quoting Ex parte Branch, 526 So.2d at 623. (Emphasis in Branch; citation omitted.) Once the responding party has articulated a race-neutral reason or explanation for eliminating the challenged jurors, the moving party can offer evidence showing that the reason or explanation is merely a sham or pretext. Ex parte Branch, 526 So.2d at 624. When the trial court has followed this procedure, its determination will be overturned only if that determination is "clearly erroneous." Id. at 625.'
"Burgess v. State, 811 So.2d 557, 572-73 (Ala.Cr.App.1998), aff'd in pertinent part, rev'd on other grounds, 811 So.2d 617 (Ala.2000)."
Rogers v. State, 819 So.2d 643, 648-49 (Ala.Crim.App.2001).
After the jury was struck, but before it was sworn, Clark made the following Batson motion:

*608 "[Clark's counsel]: Your Honor, at this time the defendant would move to reinstate Juror Number Four, [D.N.]; Juror Number Fifteen, [P.F.]; Juror Number Twenty-seven, [F.K.]; Juror Number Twenty-four, [J.C.], on the grounds of Branch versus the State of Alabama. The State has used its peremptory challenges to remove those jurors.
"The first, [D.N.], being a Native American, and the last three, [P.F.], [F.K.], and [J.C.] being black, particularly with regard to [P.F.], [F.K.], and [J.C.], those jurors were considered as strikes by the defendant because of their responses to the questionnaire and also the voir dire examination here at the bench. . . .
". . . .
". . . I don't raise that question with Juror Number Thirteen, [L.B.] I concede that there's a race neutral reason for her strike. With regard to the other three black Americans, and with respect to [D.N.], the Native American, we would ask the Court to reinstate those jurors, as the State's strike was discriminatorily exercised."
(R. 518-19.) The trial court found that Clark had not established a prima facie case of racial discrimination, but, after a lengthy discussion, the court indicated that it would "feel more comfortable" if the prosecutor stated his reasons for the strikes. (R. 524.) The prosecutor agreed and proffered his reasons for striking jurors D.N., L.B., P.F., J.C., and F.K. The trial court found these reasons to be race-neutral, and Clark made no argument and offered no evidence to establish that those reasons were pretextual. The trial court then denied Clark's Batson motion.
Initially, we note that, other than in the discussion during the Batson hearing, there is nothing in the record indicating the race of the prospective jurors on the venire or of the members of the jury itself. A "master" list of all the prospective jurors and the jury-strike list are included in the record on appeal.[5] Typically, either one or both of those lists include the race of the jurors. However, in this case, neither of those documents contains the race of the prospective jurors. In addition, although a blank copy of the questionnaire completed by the jurors before voir dire examination occurred is included in the record (the questionnaire reflects that the jurors were specifically asked to identify their race), the completed questionnaires are not included in the record and are not available for this Court's review.[6]
Although a more complete record is preferable, in this particular case, we have enough in the record to review Clark's Batson claim. In addition to the strike list indicating which prospective jurors were struck by the State and which were struck by the defense, the transcript of the Batson hearing contains more than just Clark's counsel's assertions regarding the race of prospective jurors  it contains both the prosecutor's and the trial court's agreement with those assertions. Therefore, from the record, we can discern that the prosecutor used 4 of his 14 peremptory strikes to remove 4 of 7 blacks from the venire, specifically, jurors L.B., P.F., J.C., and F.K.; that one black sat on the jury, thus indicating that Clark struck 2 blacks from the venire; and that both alternates were black. The prosecutor also exercised one strike to remove D.N., a Native American, from the jury.
*609 Much of Clark's argument on appeal focuses on the first step in the Batson inquiry  whether there was a prima facie case of racial discrimination. However, we need not address this aspect of Clark's argument because, although the trial court found that the defense had not proven a prima facie case of racial discrimination, it nevertheless requested that the prosecutor give his reasons for the strikes, and the prosecutor did so.
"[W]here, as in the present case, the trial court does not make an express finding that a prima facie case of discrimination has been established but nonetheless requires the challenged party to explain its peremptory strikes, the appellate court will presume that the trial court found a prima facie case and will evaluate the explanations offered by the challenged party."
Rogers, 819 So.2d at 648. See also Huntley v. State, 627 So.2d 1013 (Ala.1992). Because the prosecutor gave his reasons for the strikes, we presume that a prima facie case of racial discrimination was established and we proceed to the second and third steps in the Batson inquiry  whether the prosecutor's reasons for the strikes were race-neutral and whether they were pretextual.
"After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. However, this showing need not rise to the level of a challenge for cause. [Ex parte] Jackson, [516 So.2d 768 (Ala.1986)]."
Ex parte Branch, 526 So.2d 609, 623 (Ala.1987).
"Within the context of Batson, a `race-neutral' explanation `means an explanation based on something other than the race of the juror. At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.' Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). `In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons for the peremptory challenges are true, the challenges violate the Equal Protection Clause as a matter of law.' Id. `Evaluation of the prosecutor's state of mind based on demeanor and credibility lies "peculiarly within the trial judges's province."' Hernandez, 500 U.S. at 365, 111 S.Ct. at 1869."
Allen v. State, 659 So.2d 135, 147 (Ala.Crim.App.1994) (emphasis added). See also Rogers, supra.
"Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext. [People v.] Wheeler, 22 Cal.3d [258] at 282, 583 P.2d [748] at 763-64, 148 Cal.Rptr. [890] at 906 [(1978)]. Other than reasons that are obviously contrived, the following are illustrative of the types of evidence that can be used to show sham or pretext:
"1. The reasons given are not related to the facts of the case.
"2. There was a lack of questioning to the challenged juror, or a lack of meaningful questions.
"3. Disparate treatment  persons with the same or similar characteristics *610 as the challenged juror were not struck. . . .
"4. Disparate examination of members of the venire; e.g., a question designed to provoke a certain response that is likely to disqualify the juror was asked to black jurors, but not to white jurors. . . .
"5. The prosecutor, having 6 peremptory challenges, used 2 to remove the only 2 blacks remaining on the venire. . . .
"6. `An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.' Slappy [v. State], 503 So.2d [350] at 355 [(Fla.Dist.Ct.App.1987)]. For instance, an assumption that teachers as a class are too liberal, without any specific questions having been directed to the panel or the individual juror showing the potentially liberal nature of the challenged juror."
Ex parte Branch, 526 So.2d at 624. Of course, the relative plausibility and persuasiveness of the prosecutor's proffered reasons in light of the particular facts of the case must also be considered in determining whether the reasons are merely a sham or pretext. As the Court recognized in Ex parte Branch,"reasons that are obviously contrived" are, by themselves, strong evidence of pretext. 526 So.2d at 624.
When the prosecutor gave his reason for striking prospective juror D.N., the following occurred:
"[Prosecutor]: . . . [D.N.], we'll take her first. We struck [D.N.], which I did not notice was an American Indian, but it is certainly marked on the questionnaire. I'm not suggesting it's not.
"We struck her because we were understanding that on the first day of the jury selection, [D.N.] called. She was emotional about having to sit on this case and that she did not believe that she could handle this matter before a jury. And we felt like under those conditions, she should not sit on this jury.
"[Clark's counsel]: She called who?
"THE COURT: She called Brownie [the trial court's judicial assistant]. That's the one that I put on the record where I told everybody on the record that [D.N.] had called back, that she had said she had decided she couldn't emotionally handle being on a capital case and she wanted to be excused and she was told she was not excused and that she would need to report back at 8:30 tomorrow morning.
"[Clark's counsel]: We noticed no emotion in her responses to the voir dire examination. She was forthright and candid, apparently, in her answers and gave us information which would indicate that she is certainly capable of imposing the death penalty.
"THE COURT: Well, I didn't excuse her because she had an afterthought, you know, later.
"[Prosecutor]: That's not the reading I got from her.
"THE COURT: But, I mean, she did convey that information and the court did pass that along to everyone.
"[Prosecutor]: That is the reason we struck her. She had essentially asked to come off the jury because of her mental condition. . . ."
(R. 525-26.)
The record reflects that after individual voir dire of D.N. on the first day of voir dire examination, D.N. was released and told to report back the next day. At the end of the day, the following occurred:
"THE COURT: . . . I need to let you all know things about two jurors. First of all, [D.N.], Number 4, called and left word with Brownie that she had thought *611 about it and she doesn't think she can emotionally withstand a trial. And I'm just passing that along. She'll be back Wednesday, and I'm just  you know, I want to be sure you have all the information available.
"[Clark's counsel]: Emotionally?
"THE COURT: Yeah. She said emotionally she didn't think she could handle it."
(R. 334-35.)
"[S]triking a juror who has indicated his desire not to serve is a reason that does not violate Batson." Hall v. State, 820 So.2d 113, 129 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002). See also Baker v. State, [Ms. CR-95-0292, January 12, 2001] ___ So.2d ___ (Ala.Crim.App.2001); Council v. State, 682 So.2d 495 (Ala.Crim.App.), cert. denied, 682 So.2d 500 (Ala.1996); and Lewis v. State, 659 So.2d 183, 186 (Ala.Crim.App.1994). D.N.'s telephone call to the trial court after she had been released for the day indicated that she did not want to serve on the jury. The prosecutor's striking prospective juror D.N. because of her unwillingness to serve on the jury was race-neutral and is supported by the record. In addition, nothing in the record indicates that this reason was merely a pretext for discrimination.
With respect to prospective juror L.B., the record reflects that she was not included in Clark's Batson motion and that Clark expressly conceded that the prosecutor's reason for striking L.B. was race-neutral and that the strike of L.B. was therefore proper. On appeal, however, Clark argues both that the prosecutor's reason for striking L.B. was not race-neutral and that it was pretextual. Because prospective juror L.B. was expressly excluded from Clark's Batson motion at trial, we may review the arguments Clark makes on appeal with respect to L.B. only for plain error. See Rule 45A, Ala.R.App.P.
The prosecutor gave the following reason for striking prospective juror L.B.:
"We struck the next  the first black person we struck was number four. Where is the lady? That's not her. Fifteen. Thirteen. She was  gave weak answers on the capital punishment question. I think [defense counsel] has agreed that that was not a problem. That's [L.B.]"
(R. 526.)
Contrary to Clark's contention, "opposition to the death penalty is a race-neutral reason for a strike." Ex parte Travis, 776 So.2d 874, 882 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001)(upholding a prosecutor's strike of a prospective juror who "express [ed] serious reservations about the death penalty, stating that she did not think she could take a life and did not think she could vote for the death penalty, but that she might if the case was `bad enough'"). Moreover, our review of the record reveals that that reason was not merely a pretext for racial discrimination. Clark argues that the prosecutor's reason for striking prospective juror L.B. was pretextual because, according to Clark, the prosecutor did not strike prospective juror M.B. who, Clark says, was much less in favor of the death penalty than was L.B. L.B. stated during voir dire that she "would have a very difficult time in voting for death" (R. 196), but that she could vote for the death penalty if the crime was "heinous enough." (R. 221.) In addition, when the prosecutor asked if anyone objected to the manner of punishment, which, at that time, was electrocution (see Part IX of this opinion), so strongly that they "would not vote for death or would tend to lean away from the death penalty," prospective juror L.B. responded in the *612 affirmative. (R. 198.) In contrast, although M.B. stated that he did not "wholeheartedly" believe in the death penalty, he articulated numerous circumstances in which he indicated he would vote for the death penalty, none of which were based solely on the heinousness of the crime, which L.B. had indicated would be required for her to vote for the death penalty. (R. 174-75.) Furthermore, the record before us reflects that all of the prospective jurors who expressed serious reservations about voting for the death penalty were removed from the jury by the prosecutor, either by a challenge for cause or by a peremptory strike.[7] "[C]omparable treatment of similarly situated jurors of both races tends to rebut any inference of discriminatory intent in the prosecutor's strikes against black jurors." Hall v. State, 816 So.2d 80, 86 (Ala.Crim.App.1999). Therefore, we cannot say that the prosecutor's reason for striking prospective juror L.B. was pretextual.
The prosecutor stated the following reasons for striking prospective juror P.F.:
"Okay. We struck number fifteen, [P.F.] She had a brother who had been convicted of robbery. And there was, as I remember, some cocaine connection in her family that we felt like would be inappropriate for this case since he had been convicted of robbery, which is one of the offenses which the defendant stands up for, and cocaine abuse is in her family. We thought that was an appropriate race neutral strike."
(R. 526-27.) P.F. stated during voir dire that her brother had been convicted of robbery and that he was addicted to cocaine.
Clark argues that neither of those reasons were race-neutral and that one of those reasons  that P.F. had a history of cocaine abuse in her family  was pretextual because, Clark says, "the prosecutor had no problem whatsoever keeping on whites that knew someone with addiction problems." (Clark's appellate brief at p. 57.) Clark does not argue that the prosecutor's other reason for striking prospective juror P.F.  that her brother had been convicted of robbery  was pretextual.
Contrary to Clark's contention, both of the prosecutor's stated reasons for striking prospective juror P.F. were race-neutral. "Striking the relative of a person who has been convicted of a crime is racially neutral." Ex parte McNair, 653 So.2d 353, 356 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). In addition, given that one of Clark's defenses was that he was a cocaine addict and was suffering from either cocaine intoxication and/or cocaine withdrawal at the time of the crime, striking prospective juror P.F. because she had a history of cocaine abuse in her family was also facially race-neutral.
Moreover, based on our review of the record, we find that neither reason was pretextual. The record reveals that all of the prospective jurors who indicated that they had family members who were addicted to cocaine were removed from the jury, either by the prosecutor or by the defense. Although the prosecutor did not strike those jurors who had family members who were addicted to alcohol, cocaine addiction *613 and alcoholism are different. The prosecutor did not strike any prospective juror who indicated that they had family members who were addicted to alcohol, he struck only those who indicated that they had family members who were addicted to cocaine. Given that one of Clark's defenses was cocaine addiction, not alcohol addiction, we do not find it unreasonable for the prosecutor to have drawn a distinction between the two and to have stricken only those prospective jurors who had a history of cocaine addiction in their families. Nor do we find it altogether unreasonable for the prosecutor to have stricken only those prospective jurors who had family members with a cocaine addiction as opposed to those prospective jurors who had friends that had drug addictions. One juror who indicated that the son of a family friend had died from an addiction to drugs was not struck by the State, and, in fact, sat on Clark's jury; however, we cannot say that the prosecutor's failure to strike this juror establishes that his reason for striking prospective juror P.F. was pretextual. Moreover, it is clear from the record, and Clark does not argue otherwise, that the other reason for striking prospective juror P.F.  that she had a relative who had been convicted of a crime  was also not pretextual. Based on the record before us, we cannot say that the prosecutor's reasons for striking prospective juror P.F. were pretextual.
The prosecutor stated that he struck prospective juror J.C. for the following reasons:
"[J.C.] is weak on the death penalty and there was problems with cocaine. Was that the one? Let me make sure. Before I say that, I want to make sure on [J.C.] He had a cousin who was addicted to cocaine. And he was  on the death penalty, I think that something else should be done rather than the death penalty is what he answered on his death questionnaire. I think that's it."
(R. 527-28.) Clark argues that those reasons were also not race-neutral and that both reasons were pretextual. Specifically, Clark maintains that the record refutes the prosecutor's statement that J.C. was weak on the death penalty and that, therefore, that reason was pretextual; he again argues that, because the prosecutor did not strike white jurors who had alcoholism in their families, the prosecutor's striking of black jurors with cocaine addiction in their families was pretextual.
As noted previously, opposition to the death penalty is a race-neutral reason for striking a prospective juror. In this case, the fact that a prospective juror has cocaine abuse in the family is also a race-neutral reason to strike that juror. In addition, we have already explained that the prosecutor's striking prospective juror P.F. because of cocaine abuse in the family was not pretextual; therefore, striking prospective juror J.C. for that same reason also was not pretextual. As for J.C.'s views on the death penalty, the record reflects that J.C. initially indicated during voir dire that he would "automatically" vote for the death penalty after someone had been convicted of an intentional murder during a robbery. He later stated that his decision to vote for the death penalty would be influenced by whether the person convicted had been under the influence of cocaine at the time of the crime and that, if that were so, he might not vote for the death penalty. (R. 298.) However, the prosecutor stated that his belief that J.C. was weak on the death penalty was based on J.C.'s juror questionnaire in which, according to the prosecutor, J.C. indicated that "something else should be done rather than the death penalty." (R. 528.) As noted previously, the completed juror questionnaires are not available for this Court's review. However, *614 at trial Clark did not refute the prosecutor's statement with respect to the content of J.C.'s questionnaire. Thus, we are unable to determine whether the prosecutor's belief that J.C. was weak on the death penalty was erroneous. Under these circumstances, we must defer to the trial court's ruling. As this Court noted in Bang v. State, 620 So.2d 106 (Ala.Crim.App.1993):
"`We appreciate that it is impossible to know what is in the mind of another person, and that it is possible that, in stating his reasons for striking a black member of the venire, a prosecutor may give a reason that is not the true reason, but we are convinced that the trial judges in our system are in a much better position than appellate judges to decide whether the truth has been stated.' Scales v. State, 539 So.2d 1074, 1075 (Ala.1988)."
620 So.2d at 108. Based on the record before us, we cannot say that the prosecutor's stated reasons for striking J.C. were pretextual.
As for prospective juror F.K., the prosecutor stated the following:
"We struck [F.K.] Your Honor, this was the man that came before the bench and, I believe, the man appeared to me to have some type of mental difficulty. He ruminated about his son being killed and nobody giving him a good answer. And I looked into the man's eyes and it appeared to me that he had a mental disorder of some kind. And I felt like someone like that on the jury would have difficulty.
"That was my interpretation of [F.K.] Otherwise, we found no problem with [F.K.] that I saw. But, I did think he was unusual. That he  I think if you look at his questionnaire and his answers, all of it related to the death of his son, and we do not feel like he was mentally strong enough from that standpoint to sit on the jury."
(R. 527.)
Contrary to Clark's contention, the prosecutor's belief, based on F.K.'s responses during voir dire and F.K.'s answers on the jury questionnaire, that prospective juror F.K. was not "mentally strong enough" to sit on the jury due to his son's having been killed was a facially race-neutral reason for striking F.K. See, e.g., Ex parte Drinkard, 777 So.2d 295, 306 (Ala.2000)(the fact that a prospective juror has a family member who has been the victim of a crime is a race-neutral reason for a strike). Moreover, based on the record as a whole, we cannot conclude that the prosecutor's reason was pretextual.
Clark argues that the prosecutor's reason was pretextual because, he says, (1) there is no evidence in the record that F.K. had mental problems; (2) "Baldwin County has a history of speculating and of claiming that black jurors are weak minded" (Clark's appellate brief at p. 54); and (3) the prosecutor did not engage in meaningful voir dire with F.K. to determine whether his belief that F.K. was not mentally strong enough to sit on the jury was true.
We agree with Clark that there is no evidence in the record indicating that F.K. had any mental problems, and, regardless of whether Baldwin County has a history of its prosecutor's striking black prospective jurors due to perceived mental incapacity, we do not approve of a prosecutor's striking a prospective juror on the basis that the prosecutor had "looked into the man's eyes" and somehow determined that "he had a mental disorder of some kind." (R. 527.) The inherent difficulty in reviewing such a reason is obvious. Just like striking a prospective juror because of his or her demeanor, striking a prospective juror because of what the prosecutor apparently *615 saw in the prospective juror's eyes "`presents considerable difficulty to the trial courts as well as to the reviewing authorities in determining its truthfulness' and `should be closely scrutinized by both the trial and appellate courts.'" Allen, 659 So.2d at 146, quoting Avery v. State, 545 So.2d 123, 127 (Ala.Crim.App.1988).
That being said, we need not address whether the prosecutor's reason regarding F.K.'s alleged mental problems was pretextual because the prosecutor also stated that he was worried that F.K. was not "mentally strong enough" to endure sitting on a jury because of the unexplained death of F.K.'s son and, as explained below, we find that this reason was not pretextual. (R. 527.) See generally, Allen, 659 So.2d at 146-47 (although "we cannot approve of every reason given by the prosecutor . . . . the prosecutor gave at least one clearly racially neutral and acceptable reason for striking this veniremember"); Clark v. State, 621 So.2d 309, 314 (Ala.Crim.App.1992)("While some of the reasons given by the prosecutor were clearly suspect. . . the prosecutor also gave valid reasons for his strikes of the potential jurors for whom he had given the suspect or subjective reasons."); and Davis v. State, 555 So.2d 309, 314 (Ala.Crim.App.1989)("We do not need to address whether this strike was a sham, however, since the prosecutor stated an additional ground for striking this venireman.").
Contrary to Clark's contention, the prosecutor engaged in extensive voir dire with F.K. to determine his feelings about his son's death and about law enforcement generally. During voir dire, F.K. indicated that he believed the justice system was too lenient because his son had been shot to death and "to this day, [he did not] know what happened." (R. 276.) Later, during individual voir dire, the following occurred:
"[Clark's counsel]: You spoke before about that your son was killed 
"[Juror F.K.]: Yeah.
"[Clark's counsel]:  and you don't know how it happened?
"[Juror F.K.]: All I know, it happened down to a neighbor's house. They said he was playing with a gun. That's all I ever got.
"[Clark's counsel]: But it was from him being shot somehow?
"[Juror F.K.]: Yeah.
"[Clark's counsel]: Did they ever identify someone who was responsible for that or did they determine that it was an accident?
"[Juror F.K.]: They said all they could go by is what the rest of them in there said. He was playing with a gun and it accidentally went off.
". . . .
"[Prosecutor]: I have just a few questions, and I don't want to belabor a tough situation. Your son, how old was he at the time of his death?
"[Juror F.K.]: Sixteen.
"[Prosecutor]: Sixteen. And was that here in Baldwin County?
"[Juror F.K.]: Foley.
"[Prosecutor]: Foley, Alabama. Okay. About six or seven years ago?
"[Juror F.K.]: Uh-huh.
"[Prosecutor]: Okay. Do you feel badly toward anybody in Foley law enforcement or anything like that because you didn't feel like they investigated it good enough?
"[Juror F.K.]:I  they told me that it was, you know, just  I couldn't never  my problem was I never could understand at the time because I was more mad at the time. I was mad and couldn't nobody  there wasn't no answer nobody gave me at the time.

*616 "[Prosecutor]: That satisfies you. Well, I understand when a man loses his son 
"[Juror F.K.]: But they told me  you know, they  one thing about it, they let me know every week. They would always tell me, you know, what they were doing. And they gave me the number to talk to the coroner and everything. So, I ain't never  you know, I ain't going to never feel like they gave me the right answer, but I feel like they gave me  I got the best that they had to give me.
"[Prosecutor]: Okay. That they weren't trying to hide something from you, they just didn't know either; would that be fair?
"[Juror F.K.]: That's it.
"[Prosecutor]: Okay. Do you feel any type of animosity toward anybody in law enforcement because you couldn't get a good answer or an answer that satisfied a daddy about his son?
"[Juror F.K.]: No, because I know some peoples that was friends and said they knew friends and they tried and they didn't find it, so they come up with the same answer."
(R. 311-16.)
Although F.K. indicated that he harbored no animosity toward law enforcement as a result of his son's death, we do not believe that it was unreasonable for the prosecutor to doubt that answer given F.K.'s repeated statements during voir dire that he never received a satisfactory answer from law enforcement regarding his son's death. See, e.g., Rogers, supra. Moreover, the prosecutor also stated that all of F.K.'s answers on the jury questionnaire "related to the death of his son." (R. 527.) Clark did not refute the prosecutor's statement regarding the content of F.K.'s juror questionnaire and, as noted previously, the juror questionnaires are not available for this Court's review. Under these circumstances, we cannot conclude that the prosecutor's striking prospective juror F.K. because the prosecutor believed F.K. was not mentally strong enough to handle sitting on the jury due to his son's unexplained death was pretextual.
For the reasons stated above, we hold that the trial court's denial of Clark's Batson motion was not clearly erroneous.

J.E.B. Claim
Clark also contends the prosecutor improperly used 9 of his 14 peremptory strikes to remove 9 of 16 women from the venire based solely on their gender. Because Clark did not allege at trial that the prosecutor's peremptory strikes discriminated on the basis of gender, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
In Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997), the Alabama Supreme Court addressed an identical issue:
"Trawick first argues that the State used its peremptory challenges to discriminate against female jurors, in violation of J.E.B. v. Alabama, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994), and that the trial court erred by not requiring the State to articulate its reasons for its strikes of females. He points out that the State used 11 of its 14 peremptory strikes to remove women from Trawick's jury, resulting in a petit jury that was composed of 7 men and 5 women. He also argues that the prosecutor had a history of striking veniremembers based upon race. He thus concludes that his case should be remanded for a hearing on the State's reasons for striking women.
"In J.E.B. v. Alabama, the United States Supreme Court extended the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), to apply to gender discrimination *617 in jury selection. A party making a Batson or J.E.B. challenge bears the burden of proving a prima facie case of discrimination and, in the absence of such proof, the prosecution is not required to state its reasons for its peremptory challenges. Ex parte Branch, 526 So.2d 609 (Ala.1987); Ex parte Bird, 594 So.2d 676 (Ala.1991). In Branch, this Court discussed a number of relevant factors a defendant could submit in attempting to establish a prima facie case of racial discrimination; those factors are likewise applicable in the case of a defendant seeking to establish gender discrimination in the jury selection process. Those factors, stated in a manner applicable to gender discrimination, are as follows: (1) evidence that the jurors in question shared only the characteristic of gender and were in all other respects as heterogenous as the community as a whole; (2) a pattern of strikes against jurors of one gender on the particular venire; (3) the past conduct of the state's attorney in using peremptory challenges to strike members of one gender; (4) the type and manner of the state's questions and statements during voir dire; (5) the type and manner of questions directed to the challenged juror, including a lack of questions; (6) disparate treatment of members of the jury venire who had the same characteristics or who answered a question in the same manner or in a similar manner; and (7) separate examination of members of the venire. Additionally, the court may consider whether the State used all or most of its strikes against members of one gender.
"At trial, Trawick objected to the State's peremptory strikes, but objected solely on the basis of race, not gender. Trawick has offered no evidence that the female veniremembers shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently. He has offered no evidence that the prosecutor had a history of using peremptory challenges in a manner that discriminated against veniremembers of either gender. Instead, Trawick has merely emphasized that the State used many of its strikes to remove women from the venire. Without more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination."
698 So.2d at 167-68.
Similarly, in this case Clark has offered no evidence that the female veniremembers struck by the prosecutor "shared only the characteristics of gender, that anything in the type or manner of the prosecutor's statements or questions during the extensive voir dire indicated an intent to discriminate against female jurors, that there was a lack of meaningful voir dire directed at the female jurors, or that female jurors and male jurors were treated differently." Id. In addition, although Clark argues that the Baldwin County district attorney's office has a history of exercising "race and gender based strikes," (Clark's appellate brief at p. 41), he cites to only one case in which the Baldwin County district attorney's office has been found to have engaged in gender discrimination in jury selection. See Allen, supra. One instance, however, is not sufficient to establish a history of gender discrimination. The crux of Clark's argument is that the mere fact that the prosecutor used 9 of his 14 peremptory strikes to remove 9 of 16 women from the venire *618 establishes a prima facie case of gender discrimination. However, as the Supreme Court held in Ex parte Trawick,"[w]ithout more, we do not find that the number of strikes this prosecutor used to remove women from the venire is sufficient to establish a prima facie case of gender discrimination." 698 So.2d at 168. See also Ex parte Pressley, 770 So.2d 143 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000); Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002); McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___ (Ala.Crim.App.2000); Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001), judgment vacated on other grounds, 536 U.S. 953, 122 S.Ct. 2653, 153 L.Ed.2d 830 (2002), on remand to 851 So.2d 453 (Ala.2002); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); and Burgess v. State, 827 So.2d 134 (Ala.Crim.App.1998), aff'd, 827 So.2d 193 (Ala.2000), cert. denied, 537 U.S. 976, 123 S.Ct. 468, 154 L.Ed.2d 335 (2002). We find no plain error as to this claim.

III.
Clark contends that "the prosecutor repeatedly asked questions and solicited answers that violated the ultimate issue rule." (Issue VI in Clark's appellate brief at p. 92.)
Rule 704, Ala.R.Evid., provides that "[t]estimony in the form of an opinion or inference otherwise admissible is to be excluded if it embraces an ultimate issue to be decided by the trier of fact." Clark cites to two specific instances during the prosecutor's questioning of Investigator Mack that, he says, violated the ultimate issue rule. We address each in turn.

A.
First, Clark complains about the following:
"[Prosecutor]: Were you aware of Mr. Ewing and his condition?
"[Investigator Mack]: Yes, sir.
"[Prosecutor]: Did you know that Mr. Clark was a logger, a strong man?
"[Investigator Mack]: Not until later that day, but I did learn that.
"[Prosecutor]: During the course?
"[Investigator Mack]: Yes.
"[Prosecutor]: Could Mr. Clark have subdued Mr. Ewing in your opinion without stabbing him?
"[Investigator Mack]: Yes, that's possible.
"[Prosecutor]: Well, was Mr. Ewing  did you know  were you aware that Mr. Ewing was injured when he was small and could not work hard labor?
"[Investigator Mack]: In the investigation I learned that, yes.
"[Prosecutor]: Do you know who was older, Mr. Ewing or Mr. Clark?
"[Investigator Mack]: In this case, Mr. Ewing was older.
"[Prosecutor]: Was there anything about Mr. Clark's physical condition that you saw that wouldn't suggest a very healthy, very strong man from a physical standpoint?
"[Investigator Mack]: No. I mean, the time that I met [Clark] that morning and everything, he looked to be  from looks, he looked to be in good health.
"[Prosecutor]: These parts of his arms, does it appear to you that he's a muscular man or was a muscular man at that time.
"[Investigator Mack]: Yes, sir."
(R. 1517-18.) Clark maintains that this exchange violated the ultimate-issue rule because, he says, it "told the jury what result to reach regarding whether [he] acted in self-defense and whether he intentionally killed Mr. Ewing," which, he says, *619 "was [the] ultimate issue for the jury to decide." (Clark's appellate brief at p. 93.) Because Clark did not object to this testimony, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
The above testimony was elicited during the penalty phase of Clark's trial, not during the guilt phase. Contrary to Clark's contention, the ultimate issue at the penalty phase was not whether he acted in self-defense or whether he intentionally killed Ewing, but whether he should be sentenced to death or to life imprisonment without the possibility of parole. By the time this testimony was elicited, the jury had already concluded, by virtue of its guilt-phase verdict, that Clark had intentionally killed Ewing and that he had not been acting in self-defense at the time. Therefore, this testimony was not a violation of the ultimate-issue rule and we find no error, much less plain error, in the admission of this testimony during the penalty phase of the trial.

B.
Second, Clark takes issue with the following questioning of Investigator Mack during the guilt phase of his trial:
"[Prosecutor]: How many robberies have you worked since you've been an investigator, convenience store type robberies?
"[Investigator Mack]: It would be over  I'd say in the neighborhood of 25 to 30 that I've worked since I've been with the Sheriff's Department.
"[Prosecutor]: Is it unusual that the robber does not rob the person 
"[Clark's counsel]: Object, Your Honor, to the reference of any other case in comparison to this case.
"[Prosecutor]: Your Honor, [Clark's counsel] has raised in argument why he didn't take the money.
"THE COURT: The objection is overruled. You may answer.
". . . .
"[Prosecutor]: Did you understand my question? For example, if you have a convenience store robbery and a person has  how unusual is the person's money on their person not taken as opposed to the money in the drawer? Does that make any sense?
"[Investigator Mack]: In the convenience store robberies that I have worked, I would say almost all the time in my experience, the money that is taken is taken from the business itself, i.e., the cash register, the safe, the drop box, whatever. Of the 25 or 30 that I'm recalling, I can recall one specific case in which a purse of the attendant was taken and none other.
"[Prosecutor]: Okay. It doesn't mean it doesn't occur?
"[Investigator Mack]: That's correct.
"[Prosecutor]: But did you find it odd that there was still money in his pocket?
"[Clark's counsel]: Judge, I object to whether he found it odd or not.
"THE COURT: Sustained."
(R. 1060-62.)
Clark first argues that the prosecutor's use of the words "robber" and "rob" improperly "told the jury [that he] was guilty of robbery" and, thus, he claims, violated the ultimate-issue rule. (Clark's appellate brief at p. 94.) Because Clark did not object to this questioning on the ground that it violated the ultimate-issue rule, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
We do not agree with Clark that the prosecutor's use of the words "robber" and "rob" when questioning Investigator Mack was tantamount to expressing an opinion on the ultimate issue in the case, i.e., whether Clark committed a robbery. As *620 the above-quoted exchange clearly shows, the prosecutor's questioning was focused on convenience-store robberies in general, not on the particular facts of this case. As explained below, that questioning was proper to rebut one of Clark's defenses, and, because the questioning was not directed to the facts of this case, we do not believe the prosecutor's use of the words "robber" and "rob" during the questioning in any way suggested to the jury that Clark had committed a robbery.
Clark also argues that this testimony was inadmissible because, he says, the prosecutor was "attempting to take away [his] defense that he did not intend to rob Mr. Ewing." (Clark's appellate brief at p. 94.) Again, because Clark did not object on this ground at trial, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
Contrary to Clark's contention, it is not improper for a prosecutor to rebut a defense through questioning and argument; in fact, it is a prosecutor's job to do so. See generally Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001)(noting that a prosecutor is entitled to "`spotlight the defense's strategy,'" and to "point[ ] out the flaws in the defense's theory of the case"). As noted above, one of Clark's defenses was that he did not intend to rob Ewing until after he had already stabbed him and that, therefore, the murder was not committed during the course of a robbery. In support of this defense, Clark's counsel pointed out to the jury during opening statements that Ewing had over $600 in cash in his pants pocket when he was found, thus suggesting that if Clark had intended to rob Ewing, he would have taken the $600. The prosecutor was properly permitted to rebut that inference through the above-quoted questioning of Investigator Mack.
We find no error, plain or otherwise, as to this claim.

IV.
Clark contends that the trial court erred in allowing the prosecutor to introduce into evidence what he claims was "illegal and prejudicial character evidence and . . . victim impact" evidence during both the guilt phase and the penalty phase of his trial. (Issue VII in Clark's appellate brief at p. 95.) Clark appears to challenge four pieces of evidence; none of which he objected to. We address each of Clark's arguments in turn under the plain-error rule. See Rule 45A, Ala.R.App.P.

A.
First, Clark contends that the trial court erred in allowing Investigator Cook to testify during the guilt phase of the trial that, when Clark was arrested, he inventoried Clark's possessions and found a condom and a ticket regarding a domestic disturbance with his ex-wife in Clark's wallet. Clark argues that that evidence was inadmissible character evidence offered solely to "tarnish [his] character in the eyes of the jury," and introduced even though he had not placed his character in issue. (Clark's appellate brief at p. 97.)
The record reflects that during direct examination the prosecutor questioned Investigator Cook about his observations of Clark and the vehicle in which Clark was found after the murder. The following then occurred:
"[Prosecutor]: Did you do an inventory of everything?
"[Investigator Cook]: Yes, sir.
"[Prosecutor]: Did you write it down as you took it?
"[Investigator Cook]: Of the vehicle?
"[Prosecutor]: Of Mr. Clark and all the stuff that you got off of him.

*621 "[Investigator Cook]: I took an inventory. The car was processed at the Sheriff's Office.
". . . .
"[Prosecutor]: Where did you get the property from?
"[Investigator Cook]: I took the wallet out of the vehicle. It was in the glove box of the car.
". . . .
"[Prosecutor]: Was that [Rhonda Kenny's] wallet or was that Mr. Clark's wallet, or do you know?
"[Investigator Cook]: That's Mr. Clark's wallet.
"[Prosecutor]: Okay. Did it have any money in it?
"[Investigator Cook]: No, sir.
"[Prosecutor]: Any bills?
"[Investigator Cook]: No, sir. What was in the wallet was the black wallet, one Sears card, one J.C. Penney's card, a Mike's Gun Shop card, two social security cards coming back to Mr. Clark, and one Lifestyle condom.
"[Prosecutor]: And that was kind of assorted papers?
"[Investigator Cook]: And assorted papers.
"[Prosecutor]: No money?
"[Investigator Cook]: No, sir.
"[Prosecutor]: And two social security cards?
"[Investigator Cook]: Yes, sir. And everything was given back to [Clark's] mother except the ticket that he had received from Santa Rosa County Sheriff's Department. We kept that into evidence.
"[Prosecutor]: Okay. Now, what is the  what is the  when you 
"[Prosecutor]: Oh, I move that inventory into evidence, Your Honor.
"THE COURT: All right. It will be admitted.
". . . .
"[Prosecutor]: You say he got a ticket?
"[Investigator Cook]: Yes, sir.
"[Prosecutor]: What kind of ticket was it?
"[Investigator Cook]: It was issued by the 
"[Clark's counsel]: Judge  go ahead.
"[Investigator Cook]: It was issued by the Santa Rosa County Sheriff's Department. I think it was a domestic ticket. I think him and his ex-girlfriend or ex-wife or somebody had got into it.
"[Prosecutor]: I thought it was a speeding ticket?
"[Investigator Cook]: No, sir.
"[Prosecutor]: I will withdraw the question, Your Honor. I did not know the situation.
"[Prosecutor]: He had that in his wallet?
"[Investigator Cook]: It was in his wallet, yes, sir.
"[Prosecutor]: Whatever that ticket was, was there a court appearance date?
"[Investigator Cook]: I think he had to come to court on it."
(R. 928-31.) The prosecutor then continued with another line of questioning.
Rule 404, Ala.R.Evid., provides, in pertinent part:
"(a) Character Evidence Generally. Evidence of a person's character or trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
"(1) Character of Accused. Evidence of character offered by an accused, or by the prosecution to rebut the same;
". . . .
"(b) Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or *622 acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . ."[8]
It is well settled that
"`[g]ood or bad character of the accused is never an issue upon which the state may offer evidence to prove guilt unless the accused has first chosen to make it an issue.' C. Gamble, McElroy's Alabama Evidence, § 27.02(1) (5th ed.1996) (footnote omitted). `[T]he state cannot initiate the proving of the defendant's bad character to prove his guilt. "In a criminal prosecution, it is generally agreed that the state is not allowed to introduce evidence of the accused's bad character until the accused has first entered evidence of his good character."'"
Ex parte Woodall, 730 So.2d 652, 661 (Ala.1998), on remand to 730 So.2d 666 (Ala.Crim.App.1999), quoting Dockery v. State, 659 So.2d 219, 220-21 (Ala.Crim.App.1994) (citation omitted in Woodall). See also Long v. State, 838 So.2d 1067 (Ala.Crim.App.2002).[9] In this case, at the time the complained-of testimony was elicited, Clark had not placed his character in issue. Therefore, the prosecutor was not permitted to elicit evidence as to Clark's bad character for the purpose of proving action in conformity therewith.
However, we cannot, as Clark attempts to do, characterize the first piece of evidence complained of by Clark  that he had a condom in his wallet when he was arrested  as "character" evidence, much less as inadmissible character evidence. Moreover, even if we were to consider this to be inadmissible character evidence, we do not believe that Investigator Cook's single, passing reference to the condom in Clark's wallet, made in the context of his inventory of all of Clark's possessions at the time he was arrested, was in any way prejudicial to Clark.
As to the reference to the ticket Clark had apparently received for a domestic disturbance with his ex-wife, this piece of evidence falls squarely within the exclusionary rule prohibiting evidence of an accused's bad character; it does not come within any of the exceptions set out in Rule 404(b). Therefore, it was error to allow this evidence to be presented to the jury.
However, we do not believe that the error rose to the level of plain error.
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing *623 an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999), aff'd, 820 So.2d 152 (Ala.2001), cert. denied, 535 U.S. 1080, 122 S.Ct. 1966, 152 L.Ed.2d 1025 (2002).
"`The narrowness of the plain error rule is a reflection of the importance, indeed necessity, of the contemporaneous objection rule to which it is an exception. . . .
"`The contemporaneous objection rule . . . promotes the salutary interest of making the trial the main event. Failure to enforce it "tends to detract from the perception of the trial of a criminal case . . . as a decisive and portentous event." Wainwright v. Sykes, 433 U.S. 72, 90, 97 S.Ct. 2497, 53 L.Ed.2d 594 . . . (1977). Moreover, requiring timely objections allows the trial courts to develop a full record on the issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an unnecessary retrial. See United States v. Sorondo, 845 F.2d 945, 948-49 (11th Cir.1988). A full record and a prior decision in the district court are essential ingredients to our substantive review of the issues  they flesh out an issue in a way the parties' briefs may not.
"`"In the absence of plain error . . . it is not our place as an appellate court to second guess the litigants before us and grant them relief they did not request, pursuant to legal theories they did not outline, based on facts they did not relate." Adler v. Duval County School Bd., 112 F.3d 1475, 1481 n. 12 (11th Cir.1997). Because the contemporaneous objection rule is essential to the integrity and efficiency of our judicial process, we have stressed that "the plain error test is difficult to meet." United States v. King, 73 F.3d 1564, 1572 (11th Cir.1996); accord, e.g., United States v. Sorondo, 845 F.2d at 948-49; United States v. Chaney, 662 F.2d 1148, 1152 n. 4 (5th Cir. Unit B 1981).'
"United States v. Pielago, 135 F.3d 703, 709 (11th Cir.1998).
"`While the plain error doctrine lessens the blow of a rigid application of the contemporaneous objection requirement, it is to be used sparingly, since the unwarranted extension of the exacting definition of plain error would skew the rule's careful balancing of the need to encourage all trial participants to seek a fair and accurate trial the first time around against the insistence that obvious injustice be promptly redressed. Reviewing courts are not to use the plain error doctrine to consider trial court errors not meriting appellate review absent timely objection.'
"5 Am.Jur.2d Appellate Review § 767, p. 437 (1995). See also Ex parte Woodall, 730 So.2d 652, 657 (Ala.1998) (the plain-error exception is to be `used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise *624 result') (internal quotes and citations omitted [in Thomas]).
"One of the factors for the reviewing court to consider in its determination of whether an alleged error constitutes plain error is `whether a proper and timely objection at trial would have cured the error or would have enabled the trial court to prevent injustice.' 5 Am.Jur.2d, supra, at § 774, p. 443-45 (footnotes omitted). `[T]he doctrine [of plain error] is less likely to be applied where the error could have been readily corrected by an objection at trial, or where such an objection may have led the government to introduce additional evidence on the issue.' Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 27.5(d), p. 1160 (2nd ed.1992). See, e.g., United States v. Hayes, 589 F.2d 811, 825 (5th Cir.) (`Rule 52(b) will not be used to allow counsel for the defendant to gamble first on acquittal and then, upon conviction, to raise on appeal any matters which could have been easily remedied at trial.'), cert. denied, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). See also Jones v. United States, 527 U.S. 373, 386, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (preservation-of-error requirements `enable a trial court to correct any instructional mistakes before the jury retires and in that way help to avoid the burdens of an unnecessary retrial'). . . ."
Thomas v. State, 824 So.2d 1, 14-15 (Ala.Crim.App.1999).
In this case, the initial reference to the ticket was incidental; it came in the form of a nonresponsive answer by Investigator Cook to the question by the prosecutor regarding whether there were any bills in Clark's wallet. The prosecutor then pursued the line of questioning regarding the ticket, and Investigator Cook testified that the ticket was for some type of domestic disturbance. When the prosecutor realized the ticket was not for speeding, which he apparently believed it was before pursuing that line of questioning, he withdrew the question. He then asked only one more question about the ticket  whether there was a court date set for it. There was no further mention of the ticket, or the basis for the ticket, during the trial, and the inventory sheet that was introduced into evidence did not indicate that a ticket was found, it merely listed "assorted papers." (C. 195.) Although at one point Clark's counsel interrupted the questioning in what appeared to be the beginning of an objection, he appeared to change his mind and did not object, thus indicating that the failure to object was intentional. The error, however, could have easily been cured had Clark objected to the questioning. After thoroughly reviewing the record in this case, we do not believe that the error in admitting evidence of the ticket seriously affected Clark's substantial rights or the fairness and integrity of the proceedings, or that it had an unfair prejudicial impact on the jury's deliberations. As this Court noted in Thomas, 824 So.2d at 20, "[i]t is inconceivable that a jury could have been influenced, under the circumstances here, to convict [Clark] of [a] crime[ ] of the magnitude charged here because of an oblique reference to a prior [domestic dispute]." See also Ex parte Dill, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)(holding that a reference to a capital-murder defendant's parole officer did not rise to the level of plain error). Therefore, we find no plain error as to this claim.

B.
Clark also contends that "[t]he prosecutor kept trying to inflame the jury and introduce victim impact [evidence] during the guilt stage by hammering the `puppy dogs' on Mr. Ewing's checkbook." (Clark's appellate brief at p. 97.)
*625 The record reflects that when Investigator Cook and Sgt. Stewart found Ewing's bank bag in the garbage can on Fort Morgan Road, the bag had Ewing's checkbook in it. The checks apparently had pictures of puppies on them. When the prosecutor asked Hollis Byrd, Ewing's brother-in-law, to identify the checkbook, the following occurred:
"[Prosecutor]: I hand you State's Exhibit Number 80. It's in a bag. And can you determine whether or not this is [Ewing's] bank bag 
"[Byrd]: (Witness nodding head.)
"[Prosecutor]:  that you've seen before?
"[Byrd]: Oh, yeah.
"[Prosecutor]: And is that [State's Exhibit 81] his checkbook?
"[Byrd]: That's it.
". . . .
"[Prosecutor]: Did you have these puppy dogs put on his checks?
"[Byrd]: That's the kind he picked out.
"[Prosecutor]: [Ewing] 
"[Byrd]: [Ewing] picked them out.
"[Prosecutor]:  put the puppy dogs on them.
"[Byrd]: Uh-huh."
(R. 865-66.) Later, the prosecutor also asked Investigator Cook to identify the checkbook, and the following occurred:
"[Prosecutor]: State's Exhibit 81?
"[Investigator Cook]: William Ewing's checkbook.
"[Prosecutor]: With the puppy dogs on it?
"[Investigator Cook]: With the puppy dogs on it, yes, sir."
(R. 954.) In addition, during closing arguments, the prosecutor again mentioned that Ewing's checks had pictures of "puppy dogs" on them.[10]
The fact that Ewing's checks had pictures of puppies on them was not victim-impact evidence; it had nothing to do with the impact of Ewing's death on his family and friends. See generally Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002), quoting Payne v. Tennessee, 501 U.S. 808, 821, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991)("Victim-impact statements typically `describe the effect of the crime on the victim and his family.'"). Moreover, the evidence was not offered as victim-impact evidence; it was offered as a means of identifying the checkbook found in the bank bag as belonging to Ewing. However, even if we were to classify the testimony regarding Ewing's checkbook as victim-impact evidence, as Clark urges us to do, its admission does not require reversal.
In Ex parte Land, 678 So.2d 224 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), the Alabama Supreme Court stated:
"Recently, this Court examined the issue of victim impact evidence in Ex parte Rieber, 663 So.2d 999 (Ala.1995). In Rieber, we acknowledged that testimony regarding a murder victim's children was not relevant to the issue of the accused's guilt or innocence and was, thus, inadmissible during the guilt phase of the trial; we noted, however, that `a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' 663 So.2d at 1005. After thoroughly reviewing the record of *626 this present case, we conclude that the limited testimony regarding Ms. Brown's infant son and the impact of Ms. Brown's death on her family, and the prosecution's limited references to such evidence, did not operate to deny Land a fair trial or to prejudice his substantial rights. Thus, we find no reversible error as to this issue."
678 So.2d at 236.
Similarly, after reviewing the record in this case as a whole, we find no evidence that the challenged testimony affected the outcome of the trial or that it otherwise prejudiced a substantial right of Clark. Accordingly, we find no reversible error regarding this claim.

C.
Clark contends that during the penalty phase of his trial, the prosecutor improperly questioned his two defense witnesses about attempts made by he and his father to evict his ex-wife and his children from their home, which was located on property owned by Clark's father. Clark's argument in this regard consists of a paragraph containing only the allegation that this evidence constituted improper character evidence and that it "violated Rule 403 of the Alabama Rules of Evidence (substantially prejudicial) and violated the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because the state had the jury to [sic] consider arbitrary and capricious factors in its deliberations." (Clark's appellate brief at p. 97.)
We have reviewed the testimony complained of by Clark, and we find that its admission does not rise to the level of plain error. Clark offered mitigating evidence indicating that he was a good father who took care of his family for most of his life and that only after he had become addicted to cocaine did he suddenly "change" and begin acting differently. In an attempt to rebut this evidence, the State cross-examined both Clark's expert, Dr. Rosenzweig, and Clark's ex-wife, Dawn, using documents from Clark's divorce action that indicated that Dawn had asked the divorce court for help to prevent being evicted from her home. The record is not entirely clear as to the extent of Clark's involvement in the eviction attempt (it appears that it was pursued primarily by Clark's father)[11]; however, given that the eviction attempt was apparently an issue in Clark's divorce, we cannot say that it was plain error for the prosecutor to use this evidence to rebut Clark's mitigation evidence. (See discussion in Part IV.D. of this opinion regarding the State's right to rebut mitigation evidence.)

D.
Clark also contends that during the penalty phase of his trial
"[t]he prosecutor was able to get into evidence numerous bad acts that were not convictions and told the jury during closing arguments that it could consider the non-convictions to determine that [he] had a significant criminal history. To complicate matters, the trial court did not instruct the jury to disregard the non-convictions."
(Clark's appellate brief at p. 97.) Clark has not identified what alleged "bad acts" the prosecutor presented evidence about, he has not included any citations to the record, and he has not cited any authority with respect to this particular claim.[12] However, after reviewing the transcript of *627 the penalty phase of the trial, we assume that Clark is referring to the prosecutor's introducing evidence of several disciplinary problems Clark had in the county jail while awaiting trial. Although Clark introduced evidence, through his own defense witnesses, Dr. Rosenzweig and his ex-wife, Dawn, of numerous prior bad acts that did not result in convictions  including evidence that he had bought, sold, and used cocaine; that he had smoked marijuana on a regular basis; and that he had stolen items belonging to his parents and had sold them to obtain money to purchase cocaine  the only evidence of bad acts that did not result in convictions introduced by the State was evidence of Clark's disciplinary problems in jail. Therefore, based on Clark's bare argument that "[t]he prosecutor . . . [got] into evidence numerous bad acts," we must assume Clark is referring to his prison disciplinary problems.
During the penalty phase of the trial, Clark called Dr. Rosenzweig to testify on his behalf. Dr. Rosenzweig testified, in part, that she had spoken with the jail staff where Clark had been housed while awaiting trial and that she had been told that he was a "model inmate." (R. 1547.) To rebut the testimony concerning Clark's alleged good behavior while in jail, the prosecutor called Thomas S. Bryars, Jr., transportation supervisor at the county jail. Bryars testified that Clark had several disciplinary problems while in jail, including being found in possession of a handcuff key (apparently as part of a plan to attempt an escape), threatening to kill another inmate, cursing at a guard and refusing to obey an order, and getting into a fight with another inmate.
The evidence of Clark's disciplinary problems while in jail was properly admitted to rebut the mitigating evidence offered by Clark regarding his good behavior while in jail." `[O]nce the defendant presents mitigation evidence, the burden shifts to the State to disprove the factual existence of the defendant's mitigating circumstance by a preponderance of the evidence.'" George v. State, 717 So.2d 844, 846 (Ala.1996), on remand to, 717 So.2d 849 (Ala.Crim.App.1997), aff'd, 717 So.2d 858 (Ala.), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998), quoting George v. State, 717 So.2d 827, 843 (Ala.Crim.App.1996)(Cobb, J., dissenting.) "In fact, the State . . . has a greater burden in disproving the existence of mitigating circumstances than the defendant has in introducing mitigating circumstances." Dill v. State, 600 So.2d 343, 362 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993). Section 13A-5-45(g), Ala.Code 1975, provides:
"The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52. When the factual existence of an offered mitigating circumstance is in dispute, the defendant shall have the burden of interjecting the issue, but once it is interjected the state shall have the burden of disproving the factual existence of that circumstance by a preponderance of the evidence."
"At the sentence hearing evidence may be presented as to any matter that the court deems relevant to sentence and shall include any matters relating to the aggravating and mitigating circumstances referred to in Sections 13A-5-49, 13A-5-51, and 13A-5-52." § 13A-5-45(c), Ala.Code 1975. "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence. . . ." § 13A-5-45(d), Ala.Code 1975 (emphasis added).
Evidence of Clark's prison disciplinary problems was clearly offered to rebut the *628 evidence he had offered in mitigation that he was a "model inmate." (R. 1547.) The evidence was relevant and probative to sentencing and was, thus, properly admitted. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001)(evidence of the defendant's prior misdemeanor conviction and his suspension from high school was properly admitted to rebut the defendant's mitigation evidence); and Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989)(evidence that the defendant was having an incestuous relationship with his daughter was properly admitted to rebut the defendant's mitigation evidence regarding his good character).
Moreover, we have reviewed the prosecutor's closing argument during the penalty phase of the trial. Contrary to Clark's contention, the prosecutor did not argue that evidence of Clark's disciplinary problems in jail could be used to negate the statutory mitigating circumstance that Clark had no significant history of criminal activity. Rather, the only argument the prosecutor made regarding Clark's prison disciplinary problems was that Dr. Rosenzweig, in forming her opinion that Clark's judgment was impaired at the time of the crime due to cocaine withdrawal, had failed to consider numerous aspects of Clark's background, including his behavior in jail, when he was not using cocaine. Therefore, we find no error, plain or otherwise, as to this claim.

E.
Although we find no error with respect to the claims Clark raises in his brief to this Court regarding the admission of certain evidence and the prosecutor's references to that evidence during the penalty phase of the trial, we feel it is necessary to address an issue not raised by Clark concerning an argument regarding Clark's criminal history the prosecutor made to the jury during closing argument at the penalty phase of the trial. The prosecutor argued the following:
"Essentially, they have interjected three basic mitigation theories. One, that he does not have any substantial criminal record or criminal activity. My goodness. Not only has he been convicted once, he's been convicted twice. He's a habitual felon. He's been to prison. He hadn't  they had him on probation. That's what sent him to prison. When he got out, his wife and his doctor both gave you a litany of criminal activity, including buying and selling crack cocaine, including smoking marijuana, including theft, including selling things that didn't belong to him. He has a long history of criminal activity. And I submit to you that the evidence that came from the wife and from the doctor and the evidence you heard at trial knocks out that mitigation. He has a significant history of criminal activity."
(R. 1650.)
"It is well settled that `[o]nly convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity.'" Johnson v. State, 823 So.2d 1, 54 (Ala.Crim.App.2001), cert. denied, 823 So.2d 57 (Ala.2001), cert. denied, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002), quoting Freeman v. State, 651 So.2d 576, 598 (Ala.Crim.App.1994), on return to remand, 776 So.2d 160 (Ala.Crim.App.1999), aff'd, 776 So.2d 203 (Ala.), cert. denied, 531 U.S. 966, 121 S.Ct. 400, 148 L.Ed.2d 308 (2000). "[C]riminal activity that does not result in a conviction. . . cannot be used to negate the statutory mitigating circumstance of no significant history of prior criminal activity." Johnson, 823 So.2d at 54. See also Gamble v. *629 State, 791 So.2d 409, 448 (Ala.Crim.App.2000).
The prosecutor improperly argued to the jury that Clark's buying and selling cocaine, using marijuana, and stealing items not belonging to him in order to sell them to obtain money to purchase cocaine, none of which resulted in convictions, could be used by the jury to negate the statutory mitigating circumstance of no significant history of prior criminal activity. In addition, in its instructions to the jury at the penalty phase of the trial, the trial court did not instruct the jury that only convictions could negate the statutory mitigating circumstance of no significant history of prior criminal activity. The prosecutor's improper argument, coupled with the trial court's lack of instruction regarding this mitigating circumstance, raises the possibility that the jury may have improperly considered the evidence of Clark's past criminal activity that did not result in convictions to negate the statutory mitigating circumstance that he had no significant history of prior criminal activity. However, for the reasons that follow, we do not believe this error requires reversal.
In Ex parte Davis, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999), the Alabama Supreme Court addressed whether a trial court's improper consideration of a defendant's prior juvenile adjudications to negate the statutory mitigating circumstance of no significant history of prior criminal activity required remanding for the trial court to resentence the defendant where the evidence was undisputed that the defendant did, in fact, have prior convictions. In holding that any error on the part of the trial court in this regard was, at most, harmless, the Court stated that "without regard to Davis's juvenile adjudications, the evidence of Davis's convictions of various misdemeanors and, most important, his conviction of robbery, would preclude the trial court from finding that he had `no significant [criminal] history.'" Ex parte Davis, 718 So.2d at 1178 (emphasis added). Likewise, this Court has also recognized that the existence of prior convictions precludes a finding of the statutory mitigating circumstance of no significant history of prior criminal activity. See, e.g., Johnson, 823 So.2d at 54 ("Johnson had a series of misdemeanor convictions and one felony conviction that would have precluded the trial court from finding that Johnson had no significant history of prior criminal activity."). Most importantly, this Court, in our original opinion in this case, held that Clark's prior convictions[13] "preclude[ ] the trial court from finding that he had `no significant history of prior criminal activity.'" Clark v. State, 896 So.2d 584, 597 (Ala.Crim.App.2000).
If a trial court is precluded, as a matter of law, from finding the existence of the statutory mitigating circumstance of no significant history of prior criminal activity, as the court was in this case, it would be inconsistent and, indeed, illogical to allow the jury to find the existence of that mitigating circumstance. Because the trial court could not, as a matter of law, have found the existence of the statutory mitigating circumstance that Clark had no significant history of prior criminal activity, the jury likewise could not make that finding.
In Ex parte Wood, 715 So.2d 819 (Ala.), cert. denied, 525 U.S. 1042, 119 S.Ct. 594, 142 L.Ed.2d 536 (1998), the Alabama Supreme Court stated:
"Alabama law does entitle capital defendants to a sentencing-phase instruction *630 on mitigating circumstances. It is well settled that `every accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however weak, insufficient, or doubtful in credibility.' Chavers v. State, 361 So.2d 1106, 1107 (Ala.1978), citing Burns v. State, 229 Ala. 68, 155 So. 561 (1934). Although this maxim has been used most frequently to grant defendants jury charges on lesser-included offenses and affirmative defenses, it is equally applicable to entitle capital defendants to a jury instruction on mitigating circumstances, so long as some evidence has been presented to support a finding of mitigating circumstances."
715 So.2d at 822 (second emphasis added).
As noted in our original opinion in this case, there was no evidence to support a finding that Clark had no significant history of prior criminal activity, and such a finding is precluded as a matter of law because the unrefuted evidence shows that Clark had two prior felony convictions. Thus, although the trial court instructed the jury on the mitigating circumstance of no significant history of prior criminal activity, Clark was not, in fact, entitled to that instruction.
"We recognize the utmost importance of ensuring that a death sentence is not based on arbitrary and capricious action." Broadnax v. State, 825 So.2d 134, 216 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). We likewise recognize that the harmless-error rule "`is to be applied with extreme caution in capital cases,' and this caution must be observed when reviewing error in the penalty phase, for `[a]fter all, it is the penalty which distinguishes these cases from all other cases.'" Lawhorn v. State, 581 So.2d 1159, 1176 (Ala.Crim.App.1990), aff'd, 581 So.2d 1179 (Ala.), cert. denied, 502 U.S. 970, 112 S.Ct. 445, 116 L.Ed.2d 463 (1991), quoting Ex parte Whisenhant, 482 So.2d 1247, 1249 (Ala.1984), on remand, 482 So.2d 1249 (Ala.Crim.App.1984). Although we believe that an argument like the one made by the prosecutor in this case would, in some circumstances, warrant reversal, we conclude that, under the facts and circumstances of this case, the prosecutor's improper argument did not render Clark's sentencing fundamentally unfair because there is no doubt that, even without the prosecutor's improper argument and with a proper instruction by the trial court that only convictions can negate the mitigating circumstance of no significant history of prior criminal activity, the jury would not have, and, indeed, could not have, found this mitigating circumstance to exist in this case.
Additionally, we note that the trial court properly instructed the jury that it could only consider two aggravating circumstances  the two that the trial court defined  and that it could not consider any other aggravating circumstance. Thus, we do not believe that the jury improperly considered Clark's prior criminal history as a nonstatutory aggravating circumstance.
Accordingly, we hold that although the prosecutor's argument was improper, the error was, at most, harmless error and does not require reversal of Clark's sentence of death.

V.
Clark contends that the prosecutor misstated facts during the questioning of witnesses and during the opening and closing arguments at both the guilt phase and the penalty phase of his trial. (Issue VIII in Clark's appellate brief.)
"`This court has stated that "[i]n reviewing allegedly improper prosecutorial *631 comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986)(quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Crim.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Crim.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id.'
"Ferguson v. State, 814 So.2d 925, 946 (Ala.Crim.App.2000)."
Johnson v. State, 823 So.2d 1, 45-46 (Ala.Crim.App.), cert. denied, 823 So.2d 57 (Ala.2001), cert. denied, 535 U.S. 1085, 122 S.Ct. 1978, 152 L.Ed.2d 1035 (2002). We address each of Clark's claims in turn.

A.
First, Clark contends that, during his opening statement, the prosecutor improperly stated the following:
"The last and most deadly wound, I submit to you that you will find, was a puncture wound to [Ewing's] chest that entered into his heart and punctured the heart. He fell down there dying and tried to crawl back into his store. Saturday morning, Valentine's Day."
(R. 570.) According to Clark, because Dr. Riddick testified that he could not determine the order in which the numerous stab wounds were inflicted, the prosecutor's statement that the last wound was the wound to Ewing's heart was a misstatement of the facts and requires reversal. Because Clark did not object to this statement, we review this claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
Contrary to Clark's contention, the prosecutor's statement, in context of the entire trial, was a reasonable inference from the evidence. "`[T]he prosecutor, as well as defense counsel, has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference.'" Reeves v. State, 807 So.2d 18, 45 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001), quoting Rutledge v. State, 523 So.2d 1087, 1100 (Ala.Crim.App.1987), rev'd on other grounds, 523 So.2d *632 1118 (Ala.1988) (citation omitted in Reeves). See also DeBruce v. State, 651 So.2d 599 (Ala.Crim.App.1993), aff'd, 651 So.2d 624 (Ala.1994). Although Dr. Riddick testified that he could not determine the order in which the stab wounds were inflicted, he stated that the wound to Ewing's heart would have been fatal within a few minutes. In his statement to police, Clark said that Ewing was still alive and struggling to get into the store when he left the scene. Given that Ewing was still alive several minutes after the struggle began, a legitimate inference from the evidence was that the final stab wound to Ewing was, in fact, the wound that punctured his heart. There was no error, much less plain error, in the prosecutor's opening statement.

B.
Clark also maintains that the prosecutor improperly stated, during both the questioning of a witness and during closing arguments at the guilt phase, that Ewing suffered 47 stab wounds when, Clark says, the evidence at trial showed that Ewing did not suffer 47 stab wounds. Clark did not object to the prosecutor's statements in this regard; therefore, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
The record reflects that during cross-examination, Clark's counsel questioned Officer Clopton, who had executed the traffic stop of Clark after the murder, if Clark had been cooperative with him and had answered all of his questions about how Clark had gotten blood on his clothes. Officer Clopton testified that Clark had been cooperative and had told him that he had gotten into a "scuffle" and had gotten scratched on his neck. On redirect examination, the following then occurred:
"[Prosecutor]: He told you he was in a scuffle?
"[Officer Clopton]: Yes, sir.
"[Prosecutor]: He didn't tell you he had cut the man 47 times, did he, or 30 times?
"[Officer Clopton]: No, sir."
(R. 897.) Later, during closing argument, the prosecutor stated the following:
"What else did you see as to who the aggressor was? There's not a mark on him as opposed to forty-seven cuts, slaps, scrapes, and bruises and abrasions, there's not a mark on him, except a little head of hair pulled out...."
(R. 1357.)
Dr. Riddick testified that Ewing had 15 stab wounds, 17 superficial cuts, and several scrapes and abrasions on his body. The evidence showed that Ewing had been stabbed 32 times, not 47 times; however, it was not clear from the testimony what the total number of wounds on Ewing's body was, including the scrapes and abrasions that were not considered by Dr. Riddick to be stab wounds or cuts.
As to the prosecutor's questioning of Officer Clopton, we find no error. The prosecutor, although initially indicating that Ewing had been cut and/or stabbed 47 times, immediately corrected himself and said 30 times. We cannot say that the prosecutor's passing reference to 47 cuts and/or stab wounds, which the prosecutor himself corrected immediately, so infected the trial with unfairness as to make the resulting conviction a denial of due process.
As to the prosecutor's closing argument, contrary to Clark's contention, the prosecutor did not state that Ewing had been cut and/or stabbed 47 times. As the above-quoted portion of the record clearly shows, the prosecutor argued that Ewing suffered a total of 47 wounds, including cuts, scrapes, abrasions, and bruises. This was a legitimate inference from the evidence, especially in light of Dr. Riddick's *633 reference to the scrapes and abrasions on Ewing's body.
We find no plain error as to this claim.

C.
Clark also contends that the prosecutor improperly stated, on two different occasions, that Clark had not been "harmed in any way" during the struggle with Ewing. (Clark's appellate brief at p. 98.) According to Clark, because the evidence showed that a portion of Clark's hair had been pulled out during the struggle, the statements by the prosecutor that Clark had not been harmed were misstatements of the evidence and require reversal. Because Clark did not object to the statements of the prosecutor that he now challenges on appeal, we review this claim only for plain error. See Rule 45A, Ala.R.App.P.
After reviewing the record as a whole as well as the specific statements of the prosecutor about which Clark now complains, we find no error. Although on two occasions the prosecutor stated that Clark had not been harmed during the incident, when those statements are viewed in the context in which they were made and in the context of the entire trial, rather than in isolation, it is clear that the prosecutor was not misstating the evidence. Rather, the prosecutor was emphasizing to the jury that, despite Clark's attempt to place the blame for the incident on Ewing by arguing that Ewing attacked him, the evidence showed that the only serious injuries resulting from the incident were to Ewing, thus indicating that it was Clark, not Ewing, that was the initial aggressor. We find no error, much less plain error, as to this claim.

D.
Finally, Clark argues that "[t]he prosecutor presented improper vouching, arguments, and further misstatements of the facts such as telling the jury what he thought happened." (Clark's appellate brief at p. 99.) Clark cites to a string a page numbers in the record, but he makes no further argument with respect to this particular claim.
"We in no way condone a party's reliance on the mere citing of page numbers from the record, without a discussion of the pertinent facts from those pages and application of the pertinent law to those facts. We consider such reliance an indication of a lack of merit of the contention the party asserts."
Hardy v. State, 804 So.2d 247, 289 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001). See also Jackson v. State, 791 So.2d 979, 1015 (Ala.Crim.App.2000), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001).
Nevertheless, we have reviewed the entire record in this cause, including the page numbers cited by Clark with respect to this particular claim  which reveal only one objection by Clark to any of the prosecutor's questions or the argument now complained of  and we find no error, plain or otherwise.

VI.
In Issue IX in his appellate brief, entitled "Miscellaneous Issues," Clark asserts that several errors occurred throughout his trial. We address each of Clark's arguments in turn.[14]

*634 A.
First, Clark contends that the trial court improperly prevented him from presenting testimony regarding what he told Investigator Cook after he had given his statement to the police about his cocaine usage.
The record reflects that, after Clark gave his statement, he asked to smoke a cigarette. Investigator Cook took Clark outside and allowed him to smoke a cigarette; Investigator Cook and Clark had a discussion while Clark smoked his cigarette. During cross-examination of Investigator Cook, the following occurred:
"[Clark's counsel]: What did he tell you?
"[Investigator Cook]: He told me a lot of things. I mean, I don't remember anything specifically that he told me, but, I mean, we were just generally talking.
"[Clark's counsel]: Did he appear to you, we'll use [the prosecutor's] words, did he appear to you at that time to be in any way relieved to be there with you?
"[Investigator Cook]: Relieved?
"[Clark's counsel]: Yes. At ease.
"[Investigator Cook]: I think he was relieved that he had told me and [Sgt. Stewart] what he had told us. I think, yeah, that was some pressure off of him. Yes, sir, I'll go with that.
"[Clark's counsel]: Did he explain to you what he had been doing for the past three years?
"[Investigator Cook]: As far as 
"[Clark's counsel]: Do you remember a discussion about crack cocaine, Mike?
"[Investigator Cook]: Yes, sir. He did tell me he had been on crack. Yes, sir.
"[Clark's counsel]: For how long?
"[Investigator Cook]: He could have said three years.
"[Clark's counsel]: Did he say anything about that or about how he felt about it or what he wanted to do about it?
"[Prosecutor]: Your Honor, I object to this form of questioning.
"THE COURT: Sustained.
"[Prosecutor]: It's improper.
"[Clark's counsel]: Improper?
"[Prosecutor]: Yes, Your Honor. He can't  I can't say it unless I approach the bench.
"(Held at the bench:)
"[Prosecutor]: He cannot get into information from this officer from Mr. Clark under the rules of evidence. He is  what he's trying to do 
"[Clark's counsel]: You can, but I can't?
"[Prosecutor]: That's absolutely correct. You have to  in order to be able to get it in, you couldn't let him go and tell his whole defense to somebody, then let somebody come in and tell it. And it's the same way with other officers. If he wants to get this type of information in, he would have to bring on Mr. Clark. I can't cross-examine the remarks of Mr. Clark with this officer. And it is my understanding that he would not be able to get in this type of information through this officer.
"[Clark's counsel]: I don't know of any reason why we can't get into the substance of conversations with officers. [The prosecutor], the prosecution, typically does that.

*635 "[Prosecutor]: It's a statement against interest.
"THE COURT: Sustained.
"[Clark's counsel]: Huh?
"THE COURT: You can put something else on the record 
"[Clark's counsel]: Do what?
"THE COURT: You can put something else on record, if you'd like to.
"[Prosecutor]: That's my understanding of the law. And I might be wrong, but I'm 99 percent positive I'm right. Now, if he wants to ask him about things that related to the questioning and things of that nature, I have no objection. And I did not object to him getting into the general cocaine. But asking him questions about how he felt about being on cocaine, I don't think is appropriate.
"THE COURT: That might have been pushing it.
"[Prosecutor]: And that's why 
"THE COURT: The objection is sustained.
"[Prosecutor]: And that's why I jumped in, [counsel]. I did not object to the cocaine."
(R. 980-83.)
On appeal, Clark's entire argument as to this issue is as follows:
"Defense counsel sought to ask questions concerning what [Clark] told officer [Mike Cook] concerning his crack cocaine usage to show [Clark's] state of mind, but the prosecutor objected, and the trial court sustained. (R. 981-83.) See also Charles W. Gamble, McElroy's Alabama Evidence, § 273.02 (5th ed. 1996)(`The courts have adhered to the wide latitude rule relating to the admissibility of evidence as to the conduct and condition of a criminally accused offered in support of a plea of insanity.') [[15]]."
(Clark's appellate brief at p. 99.) From Clark's bare statement and the citation to McElroy's Alabama Evidence, we assume that he is arguing that he should have been permitted to question Investigator Cook about statements he made regarding his cocaine usage in order to show his state of mind at the time of the crime and, thus, to prove that he was suffering from cocaine intoxication or cocaine withdrawal to the extent that he was unable to form the intent to kill.
"Whatever rule there may be governing other situations in the law of evidence regarding the admission of self-serving acts, a party's conduct, including such party's own declarations, are admissible when offered to show the mental incapacity or capacity of that party." Charles W. Gamble, McElroy's Alabama Evidence § 61.01(4) (5th ed.1996)(footnote omitted). See also Hunter v. State, 491 So.2d 1079 (Ala.Crim.App.1986). Although wide latitude is given in the admission into evidence of an accused's conduct and condition when offered to support a plea of insanity, this latitude is necessarily limited by relevancy requirements; to be admissible, the act, conduct, or declaration must shed light on the person's mental state at the time of the crime. In this case, contrary to Clark's contention, what he "felt" about his cocaine addiction several hours after the murder or "what he wanted to do about" his cocaine addiction did not in any way shed light on his mental state at the time of the crime, i.e., it did not tend to show that he was suffering from cocaine intoxication and/or withdrawal at the time of the crime to the extent that he was unable to form the intent to kill. Therefore, *636 the trial court did not err in excluding this testimony.

B.
Second, Clark contends that the trial court improperly limited his cross-examination of Investigator Mack.
The record reflects that the prosecutor called Investigator Mack to testify on three different occasions during the State's case-in-chief, apparently in an attempt to present the State's case to the jury in an organized fashion. The first time Investigator Mack testified, he testified as to the initial call he had received about the crime and as to his observations of the crime scene; he also identified photographs taken of the crime scene, and he narrated as the videotape he had taken of the crime scene was played for the jury. During cross-examination, Clark's counsel questioned Investigator Mack about his observations of Clark after Clark had been arrested and about Clark's statement to the police. He also questioned him about the blood found at the crime scene both inside and outside the store, which Investigator Mack had testified indicated to him that Ewing had moved around at some point during the struggle with Clark. Clark maintains that his cross-examination of Investigator Mack in this instance was improperly restricted, based on the following exchange:
"[Clark's counsel]: Okay. You testified and supported your testimony by photographs, that because of the way Mr. Ewing's body lay, it would have been necessary to step over him or across him in order to get back in the store.
"[Investigator Mack]: Yes.
"[Clark's counsel]: You know that Mr. Clark has made a statement and said he went back in the store?
"[Investigator Mack]: Yes.
"[Clark's counsel]: Is there any way that you can tell where Mr. Ewing's body was at the time Mr. Clark went back into the store?
"[Investigator Mack]: At that point in time, no.
"[Clark's counsel]: And if indeed 
"[Prosecutor]: Your Honor, cross-examination is suppose to be based on the testimony elicited from the State, not testimony that has not yet been placed into evidence. And I stopped at the point where I thought  he's cross-examining him on things that haven't occurred, that haven't been introduced yet.
"THE COURT: Sustained.
"[Clark's counsel]: You don't know where Mr. Ewing's body was 
"[Clark's counsel]: Does that mean that the State doesn't intend to use the statement given by Mr. Clark?
"[Prosecutor]: No. He hasn't been questioned about the statement.
"THE COURT: No, just that it hasn't been introduced yet. He hasn't asked him.
"[Clark's counsel]: Mr. Clark was questioned, wasn't he?
"[Investigator Mack]: He was.
"[Clark's counsel]: And he did give a statement, didn't he?
"[Investigator Mack]: He did.
"[Clark's counsel]: And he said he went back in the store?
"[Investigator Mack]: He did.
"[Clark's counsel]: Now, you don't know, do you, Hoss, where Mr. Ewing may have been at that time?
"[Investigator Mack]: No."
(R. 673-75.)
Clark's entire argument regarding this exchange is as follows:
"During defense counsel's cross-examination of Huey Mack, Jr., the prosecutor objected that defense counsel's *637 cross-examination exceeded the scope of the prosecutor's examination, and the trial court sustained the prosecutor's objection so defense counsel was not able to cross-examine this witness as properly allowed by law. See Ball v. State, 337 So.2d 31, 35 (Ala.Crim.App.1976) and (R. 674)."
(Clark's appellate brief at p. 100.)
Contrary to Clark's contention, it appears that, although the trial court initially sustained the prosecutor's objection to Clark's line of questioning regarding his statement to police, Clark's counsel continued with the same line of questioning without any further objection by the prosecutor and was, in fact, allowed to cross-examine Investigator Mack about Clark's statement. In his single-sentence argument on this issue, Clark does not identify what questions he believes he was prevented from asking Investigator Mack or how this alleged error affected his trial. Moreover, when the prosecutor called Investigator Mack to testify a second time during the State's case-in-chief, the prosecutor again questioned him about the crime scene, and he also questioned him about his observations of Clark at the Gulf Shores Police Department just before Clark was interviewed. Clark's counsel had the opportunity at this point to further cross-examine Investigator Mack about Clark's statement, but he did not do so. Clearly, Clark was not denied his right to cross-examine Investigator Mack.

C.
Third, Clark contends that the trial court erred in precluding his expert, Dr. Rosenzweig, from testifying that "based upon her examination of Mr. Ewing's wounds, [Clark] did not intend to kill him." (Clark's appellate brief at p. 100.)
As noted previously, Dr. Rosenzweig, testifying in Clark's defense, stated that, in her opinion, Clark did not intend to kill Ewing. When asked to "explain" the basis of her opinion, Dr. Rosenzweig began to testify about the information she had examined in reaching her conclusion; when she mentioned the autopsy report and pictures of Ewing's wounds, the prosecutor objected. (R. 1241.) Outside the presence of the jury, Clark argued that Dr. Rosenzweig should be allowed to testify that "her opinion that this was not an intentional murder is based to some extent on the wounds to Mr. Ewing's body." (R. 1248.) Dr. Rosenzweig then informed the court that a widely accepted "area of forensic psychology called profiling" involves looking at the nature of the victim's wounds in order to infer the mental state of the perpetrator, and that she had relied, at least in part, on the fact that many of Ewing's wounds were superficial in forming her opinion that Clark did not intend to kill Ewing. (R. 1248.) The prosecutor objected to the testimony on the ground that Dr. Rosenzweig was not a pathologist and, thus, not qualified to testify about Ewing's wounds. The trial court sustained the objection, ruling that Dr. Rosenzweig could not "talk about those wounds" because she was "not a pathologist." (R. 1261.)
It is not entirely clear from his brief to this Court what Clark is arguing with respect to this issue. His "argument" is only four sentences long and the only authority cited are Rules 702 and 703, Ala.R.Evid., and C. Gamble, McElroy's Alabama Evidence § 127.02 et seq. (5th ed.1996).
To the extent that Clark may be arguing that Dr. Rosenzweig should have been allowed to testify as to her opinion that Clark did not intend to kill Ewing, the record reflects that she was permitted to testify as to that opinion. As noted previously, Dr. Rosenzweig testified that it was her opinion that Clark did not intend to kill Ewing, that Clark was suffering from *638 paranoia due to withdrawal from cocaine, and that Clark's judgment was impaired at the time of the crime.
To the extent that Clark may be arguing that Dr. Rosenzweig should have been allowed to testify that her opinion about Clark's intent was based, at least in part, on the superficial nature of many of Ewing's wounds, Clark has failed to allege, much less show, that he was prejudiced in any way by the restrictions placed on Dr. Rosenzweig's testimony. Assuming, for the sake of argument, that Dr. Rosenzweig should have been allowed to testify that the nature of the wounds was, in part, the basis of her opinion with respect to Clark's intent, we point out that, in addition to testifying that she believed Clark did not intend to kill Ewing, Dr. Rosenzweig also testified that her opinion was based on "all of the information" she had gathered and looked at when first asked to perform her evaluation, including, she said, her own interviews with Clark and various collateral sources, police reports, witness statements, crime-scene findings, the autopsy report, the audiotape of Clark's statement to the police, a transcript of a preliminary hearing in the case, and a report from Dr. DeFranscisco, the court-appointed forensic psychologist who also evaluated Clark. (R. 1265.) That testimony clearly made the jury aware that Dr. Rosenzweig's opinion was based, at least in part, on the nature of Ewing's wounds. Therefore, any error on the part of the trial court in not allowing Dr. Rosenzweig to specifically testify that her opinion was based, at least in part, on the nature of Ewing's wounds, was, at most, harmless error.

D.
Finally, Clark contends that the trial court erred in denying his motions for a judgment of acquittal, made at the close of the State's case and at the close of all the evidence, because, he says, "he did not intend to kill Mr. Ewing [and]... he did not intend to take the money until after the victim died." (Clark's appellate brief at pp. 99-100.) According to Clark, because he told police in his statement that he did not intend to kill Ewing and that he did not intend to take Ewing's money until after Ewing was already dead, the State necessarily failed to prove a prima facie case of capital murder committed during a robbery.
Although couched in terms of the sufficiency of the evidence, Clark's argument actually goes to the weight of the evidence, not its sufficiency. "`[T]he "weight of the evidence" refers to "a determination [by] the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other."'" Johnson v. State, 555 So.2d 818, 820 (Ala.Crim.App.1989), quoting Tibbs v. Florida, 457 U.S. 31, 37-38, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982)(emphasis added in Johnson). "We have repeatedly held that it is not the province of this court to reweigh the evidence presented at trial." Whitt v. State, 733 So.2d 463, 470 (Ala.Crim.App.1998). "`[T]he credibility of witnesses and the weight or probative force of testimony is for the jury to judge and determine.'" Harris v. State, 513 So.2d 79, 81 (Ala.Crim.App.1987), quoting Byrd v. State, 24 Ala.App. 451, 451, 136 So. 431, 431 (1931)." `When the jury has passed on the credibility of evidence tending to establish the defendant's guilt, this Court cannot disturb its finding.'" Rowell v. State, 647 So.2d 67, 69 (Ala.Crim.App.1994), quoting Collins v. State, 412 So.2d 845, 846 (Ala.Crim.App.1982). "Any issues regarding the weight and credibility of the evidence are not reviewable on appeal once the state has made a prima facie case." Jones v. State, 719 So.2d 249, 255 (Ala.Crim.App.1996), aff'd, 719 So.2d 256 (Ala.1998).
On the other hand, "[t]he sufficiency of the evidence concerns the question *639 of whether, `viewing the evidence in the light most favorable to the prosecution, [a] rational fact finder could have found the defendant guilty beyond a reasonable doubt.'" Johnson, 555 So.2d at 819, quoting Tibbs v. Florida, 457 U.S. at 37, 102 S.Ct. 2211. "`In determining the sufficiency of the evidence to sustain a conviction, a reviewing court must accept as true all evidence introduced by the State, accord the State all legitimate inferences therefrom, and consider all evidence in a light most favorable to the prosecution.'" Ballenger v. State, 720 So.2d 1033, 1034 (Ala.Crim.App.1998), quoting Faircloth v. State, 471 So.2d 485, 488 (Ala.Crim.App.1984), aff'd, 471 So.2d 493 (Ala.1985). "`When there is legal evidence from which the jury could, by fair inference, find the defendant guilty, the trial court should submit [the case] to the jury, and, in such a case, this court will not disturb the trial court's decision.'" Farrior v. State, 728 So.2d 691, 696 (Ala.Crim.App.1998), quoting Ward v. State, 557 So.2d 848, 850 (Ala.Crim.App.1990). "The role of appellate courts is not to say what the facts are. Our role ... is to judge whether the evidence is legally sufficient to allow submission of an issue for decision [by] the jury." Ex parte Bankston, 358 So.2d 1040, 1042 (Ala.1978).
"`The question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve.' Rowell v. State, 570 So.2d [848,] 850 [(Ala.Crim.App.1990)], citing Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App.1983). Intent to kill may be inferred from the use of a deadly weapon. See Long v. State, 668 So.2d 56, 60 (Ala.Cr.App.1995); Buskey v. State, 650 So.2d 605, 609 (Ala.Cr.App.1994). Intent is rarely shown by direct proof, and may be inferred from the surrounding circumstances of the case. Paige v. State, 494 So.2d 795, 796 (Ala.Cr.App.1986). `[C]ircumstantial evidence is entitled to the same weight as direct evidence, provided it points to the guilt of the accused.' Stephens v. State, 580 So.2d 11, 24 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991). In Bishop v. State, 482 So.2d 1322 (Ala.Cr.App.1985), this Court stated,
"`"The intention to do great bodily harm, to murder or commit any other crime by means of an assault, may be inferred from the circumstances. Circumstantial evidence is usually the only available evidence of intention aside from declarations of the accused. The intention may be inferred from the force or direction, or from the natural or contemplated result of the violence employed, from the weapon or implement used by the accused, from his threats or prior conduct towards the person assaulted, and generally from the extent and effect of the injury inflicted, or from any deliberate action which is naturally attempted and usually results in danger to the life of another."'
"482 So.2d at 1326, quoting Underhill on Criminal Evidence, § 540 (3d ed.1923)."
Daniels v. State, 762 So.2d 864, 865-66 (Ala.Crim.App.1999).
In this case, the State presented ample evidence from which the jury could have concluded beyond a reasonable doubt that Clark intended to rob and to kill Ewing, including, but not limited to: the use of a deadly weapon; the circumstances surrounding the murder; the extent of the victim's injuries; the presence of a ski mask in Clark's vehicle when he was arrested; and Kenny's testimony that Clark had told her when he left the morning of the murder that he was planning to get more money, apparently to purchase more cocaine. "The fact that the defense's version *640 of events conflicted with the State's version did not render the evidence insufficient; any conflict in the evidence was a matter of weight and credibility to be resolved by the jury." Carroll v. State, 852 So.2d 801, 812 (Ala.Crim.App.1999), aff'd in pertinent part, remanded on other grounds, 852 So.2d 821 (Ala.2001). The trial court did not err in denying Clark's motions for a judgment of acquittal.

VII.
Clark also contends that the trial court erred in not instructing the jury on heat-of-passion (provocation) manslaughter, see § 13A-6-3(a)(2), Ala.Code 1975, as a lesser-included offense of capital murder. (Issue V in Clark's appellate brief.) He argues that there was a reasonable theory of the evidence from which the jury could have concluded that he stabbed Ewing due to a sudden heat of passion aroused in him when Ewing approached him wielding a stick. He refers to the well-established precedent that heat-of-passion manslaughter is "`designed to cover those situations where the jury does not believe a defendant is guilty of murder but also does not believe the killing was totally justified by self-defense.'" Williams v. State, 675 So.2d 537, 541 (Ala.Crim.App.1996), quoting Shultz v. State, 480 So.2d 73, 76 (Ala.Crim.App.1985). According to Clark, the jury in this case could have concluded, based on his statement to the police, that, although the killing was not totally justified by self-defense, he was nevertheless not guilty of murdering Ewing.
The record reflects that the trial court instructed the jury on felony murder, intentional murder, reckless manslaughter, and criminally negligent homicide as lesser-included offenses of capital murder. During the charge conference, the trial court specifically asked Clark's counsel if he also wanted the jury to be charged on heat-of-passion manslaughter; Clark's counsel replied, "No. This is not a heat of passion." (R. 1315.) Any error, therefore, in the trial court's not charging the jury on heat-of-passion manslaughter was invited by Clark himself.
"`"`"A party cannot assume inconsistent positions in the trial and appellate courts and, as a general rule, will not be permitted to allege an error in the trial court proceedings which was invited by him or was a natural consequence of his own actions."'" Slaton v. State, 680 So.2d 879, 900 (Ala.Crim.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Campbell v. State, 570 So.2d 1276, 1282 (Ala.Crim.App.1990). As we have said in applying the invited-error doctrine, "`It would be a sad commentary upon the vitality of the judicial process if an accused could render it impotent by his own choice.'" Murrell v. State, 377 So.2d 1102, 1105 (Ala.Crim.App.), cert. denied, 377 So.2d 1108 (Ala.1979), quoting Aldridge v. State, 278 Ala. 470, 474, 179 So.2d 51, 54 (1965). "The invited error rule has been applied equally in capital cases and noncapital cases." Rogers v. State, 630 So.2d 78, 84 (Ala.Crim.App.1991), rev'd on other grounds, 630 So.2d 88 (Ala.1992), aff'd on remand, sub nom. Musgrove v. State, 638 So.2d 1347 (Ala.Crim.App.1992), aff'd, 638 So.2d 1360 (Ala.1993), cert. denied, 513 U.S. 845, 115 S.Ct. 136, 130 L.Ed.2d 78 (1994).'
"Perkins v. State, 808 So.2d 1041 (Ala.Crim.App.1999), aff'd, 808 So.2d 1143 (Ala.2001). '"An invited error is waived, unless it rises to the level of plain error."' Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991). `To rise to the level of plain error, the claimed error must not only seriously *641 affect a defendant's "substantial rights," but it must also have an unfair prejudicial impact on the jury's deliberations.' Hyde v. State, 778 So.2d 199, 209 (Ala.Crim.App.1998), aff'd, 778 So.2d 237 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001)."
McNabb v. State, 887 So.2d 929, 892-93 (Ala.Crim.App.2001).
"A person accused of the greater offense has a right to have the court charge on lesser included offenses when there is a reasonable theory from the evidence supporting those lesser included offenses." MacEwan v. State, 701 So.2d 66, 69 (Ala.Crim.App.1997). An accused has the right to have the jury charged on "`any material hypothesis which the evidence in his favor tends to establish.'" Ex parte Stork, 475 So.2d 623, 624 (Ala.1985). "[E]very accused is entitled to have charges given, which would not be misleading, which correctly state the law of his case, and which are supported by any evidence, however[ ] weak, insufficient, or doubtful in credibility," Ex parte Chavers, 361 So.2d 1106, 1107 (Ala.1978), "even if the evidence supporting the charge is offered by the State." Ex parte Myers, 699 So.2d 1285, 1290-91 (Ala.1997), cert. denied, 522 U.S. 1054, 118 S.Ct. 706, 139 L.Ed.2d 648 (1998). However, "[t]he court shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." § 13A-1-9(b), Ala.Code 1975. "The basis of a charge on a lesser-included offense must be derived from the evidence presented at trial and cannot be based on speculation or conjecture." Broadnax v. State, 825 So.2d 134, 200 (Ala.Crim.App.2000), aff'd, 825 So.2d 233 (Ala.2001), cert. denied, 536 U.S. 964, 122 S.Ct. 2675, 153 L.Ed.2d 847 (2002). "`A court may properly refuse to charge on a lesser included offense only when (1) it is clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense, or (2) the requested charge would have a tendency to mislead or confuse the jury.'" Williams v. State, 675 So.2d 537, 540-41 (Ala.Crim.App.1996), quoting Anderson v. State, 507 So.2d 580, 582 (Ala.Crim.App.1987).
In this case, there was no reasonable or rational theory from the evidence to support a charge on heat-of-passion manslaughter. The only evidence Clark points to, and the only possible evidence that could have been used to argue heat-of-passion manslaughter, was Clark's statement to the police in which he told police that he stabbed Ewing only after Ewing had approached him wielding a stick. However, the Alabama Supreme Court has recognized that, in certain situations, an accused's self-serving statement may not be sufficient, by itself, to warrant an instruction on a lesser-included offense. See Ex parte McWhorter, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001). In McWhorter, the appellant had given a statement to the police in which he initially stated that he was so intoxicated that he did not remember the crime. As the interview with police continued, however, the appellant began to remember, in detail, how the crime was committed, and he confessed. On appeal, he argued that the trial court had erred in not instructing the jury on a number of lesser-included offenses (including felony murder, intentional murder, and manslaughter), based on his statement to the police that he had been intoxicated. In finding that the trial court had not erred in not instructing the jury on the lesser-included offenses, the Supreme Court stated:
"The evidence offered by McWhorter as to his alleged intoxication was glaringly inconsistent with his own statement *642 giving detailed descriptions of the events occurring at the crime scene. No evidence substantiated his claim to have been intoxicated at the time of the killing, and, indeed, the other evidence as to his condition at the time of the crime was totally consistent with the proposition that he was sober. We hold that McWhorter's self-serving statements suggesting he was intoxicated at the time of the killing, statements made in his internally inconsistent interview by Detective Maze, is, as a matter of law, insufficient to satisfy the rigorous standard of showing that the intoxication relied upon to negate the specific intent required for a murder conviction amounted to insanity."
Ex parte McWhorter, 781 So.2d at 342 (emphasis added).
Although McWhorter did not involve the same factual situation as that presented here, we find the Alabama Supreme Court's opinion in McWhorter to be persuasive in our resolution of this issue. In this case, as in McWhorter, the only evidence supporting a charge on heat-of-passion manslaughter was Clark's self-serving statement to the police. Although that statement was not internally inconsistent, as was the statement in McWhorter, it was directly refuted by undisputed physical evidence from the crime scene. When police officers arrived at the crime scene, the stick that Clark claimed Ewing had wielded as he approached Clark in front of the checkout counter was found propped up on end against the wall in a corner behind the counter. Under Clark's theory of the case, either he or a stabbed and bleeding Ewing must have taken the time at some point either during the struggle or after the struggle to walk behind the counter and place the stick on end up against the wall. This theory is simply not reasonable.
We will not find plain error in a trial court's refusal to instruct a jury on a lesser-included offense where the only evidence tending to bring the crime within the definition of that lesser-included offense is a defendant's self-serving statement and where that statement is directly refuted by undisputed physical evidence. We hold, therefore, that under the circumstances in this case, it was not plain error for the trial court not to instruct the jury on heat-of-passion manslaughter as a lesser-included offense of capital murder.

VIII.
Clark contends that "the death penalty systems in Alabama and in the United States must be declared unconstitutional" as violative of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution because, he says, "the death penalty system allows racism, geography, politics, sympathy for the victim, and other arbitrary, capricious, and irrational factors to influence the imposition of the death penalty." (Issue X in Clark's appellate brief at p. 114.) He provides a laundry list of what he says are the problems with the death-penalty schemes throughout the United States and he cites to numerous studies regarding the death penalty in the United States. His entire argument concerns the death penalty in general, and he makes no arguments specific to his case or specific to Alabama's capital statute.
However, both the death penalty in general and Alabama's capital-murder statute in particular have been upheld against a variety of constitutional attacks. See Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)(holding that Alabama's capital statute does not violate the Eighth Amendment); Gregg v. Georgia, 428 U.S. 153, 169, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)(plurality opinion)(holding that "the punishment of death *643 does not invariably violate the Constitution"); Proffitt v. Florida, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)(holding that the death penalty is not per se violative of the Eighth Amendment); and Ex parte Taylor, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002)(holding that Alabama's capital-murder statute does not violate the Fourteenth Amendment). Contrary to Clark's contention, the death penalty is not per se unconstitutional and, therefore, Clark's argument is meritless.

IX.
Clark contends that death by electrocution is cruel and unusual punishment that violates the Eighth Amendment to the United States Constitution and Art. 1, § 15, Alabama Constitution of 1901. (Issues XI and XII in Clark's appellate brief.)
Recently, the Alabama Legislature amended § 15-18-82, Ala.Code 1975, which sets out the time, place, and method of executions in Alabama, and it added § 15-18-82.1, Ala.Code 1975. Section 15-18-82.1(a) provides:
"A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution. The sentence shall be executed pursuant to Section 15-18-82."
Newly amended § 15-18-82(a) now provides:
"Where the sentence of death is pronounced against a convict, the sentence shall be executed at any hour on the day set for the execution, not less than 30 nor more than 100 days from the date of sentence, as the court may adjudge, by lethal injection unless the convict elects execution by electrocution as provided by law. If electrocution is held unconstitutional, the method of execution shall be lethal injection."
These sections became effective July 1, 2002, and apply to all inmates currently on death row. Because the primary method of execution in Alabama has been changed from electrocution to lethal injection, Clark's argument is moot. See Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); Tomlin v. State, [Ms. CR-98-2126, May 31, 2002] ___ So.2d ___ (Ala.Crim.App.2002); and Duke v. State, 889 So.2d 1 (Ala.Crim.App.2002).

X.
Clark contends that the State should have the burden of disproving the existence of a mitigating circumstance beyond a reasonable doubt or by clear and convincing evidence rather than by a preponderance of the evidence as set out in § 13A-5-45, Ala.Code 1975. (Issue XIII in Clark's appellate brief.) According to Clark, by allowing the State to disprove the existence of a mitigating circumstance "by a mere preponderance, the code is improperly taking away mitigation evidence that the jury and trial court should be considering." (Clark's appellate brief at p. 131.)[16] Because Clark did not present *644 this argument to the trial court, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
Contrary to Clark's contention, placing on the State the burden of disproving by a preponderance of the evidence the existence of a mitigating circumstance does not preclude the jury or the trial court from considering that circumstance. Rather, it provides guidance for making the determination of whether that circumstance exists. Considering mitigating evidence and finding the existence of a mitigating circumstance are two different concepts. All mitigating evidence must be considered, but not all mitigating evidence has to be found to be a mitigating circumstance. Therefore, requiring the State to disprove mitigating circumstances by a preponderance of the evidence does not affect the jury's or the trial court's consideration of mitigating evidence, and Clark's argument in this regard is meritless.
Moreover, to the extent that Clark's argument could be construed to be a challenge to the constitutionality of § 13A-5-45(d), this Court has previously rejected such an argument with respect to the State's burden of disproving the existence of mitigating circumstances. See, e.g., Dill v. State, 600 So.2d 343, 362 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993)("We do not find Alabama's method of allocating the burdens of proof unconstitutional."); and Haney v. State, 603 So.2d 368, 391 (Ala.Crim.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993)("Since the burden to prove mitigating circumstances could constitutionally be placed entirely on a defendant, this appellant is not justified in complaining about the statute which places a burden on the state to disprove evidence offered in mitigation when the factual existence of the mitigating evidence is in dispute.").
We find no error, plain or otherwise, as to this claim.

XI.
Clark contends that the trial court erred in treating robbery as both an element of the capital offense and as an aggravating circumstance. (Issue XV in Clark's appellate brief.) Because Clark did not raise this issue in the trial court, we review it under the plain-error rule. See Rule 45A, Ala.R.App.P.
Both this Court and the Alabama Supreme Court have repeatedly held that the practice known as "double counting" or "overlapping" is constitutional. See Ex parte Windsor, 683 So.2d 1042 (Ala.1996), cert. denied, 520 U.S. 1171, 117 S.Ct. 1438, 137 L.Ed.2d 545 (1997); Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2001); Ferguson v. State, 814 So.2d 925 (Ala.Crim.App.2000), aff'd, 814 So.2d 970 (Ala.2001), cert. denied, 535 U.S. 907, 122 S.Ct. 1208, 152 L.Ed.2d 145 (2002); Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000), aff'd, 820 So.2d 883 (Ala.2001), cert. denied, 535 U.S. 1058, 122 S.Ct. 1921, 152 L.Ed.2d 828 (2002); Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001); Taylor v. State, 808 So.2d 1148 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), cert. denied, 534 U.S. 1086, 122 S.Ct. 824, 151 L.Ed.2d 705 (2002); Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999), cert. denied, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000); Hardy v. State, 804 So.2d 247 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.), cert. denied, *645 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000); Price v. State, 725 So.2d 1003 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); and Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995). Thus, we find no error in the trial court's "double counting" robbery as both an element of the capital offense and as an aggravating circumstance.

XII.
Clark contends that the trial court erred in finding the existence of the aggravating circumstance that the murder of Ewing was especially heinous, atrocious, or cruel when compared to other capital offenses. (Issue III in Clark's appellate brief.)
"In Furman v. Georgia, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court of the United States held that the application of certain state death penalty statutes violated the Eighth Amendment to the United States Constitution as applied to the states through the Due Process Clause of the Fourteenth Amendment. The Supreme Court held that those statutes' lack of principled standards to prevent the sentencing authority from arbitrarily and capriciously imposing capital punishment rendered the application of the sentencing scheme constitutionally infirm. E.g., id. at 310, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (Stewart, J., concurring); id. at 311, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (White, J., concurring).
"Since Furman, many states have revised their death penalty statutes to require that the sentencing authority consider aggravating and mitigating circumstances, thus limiting the discretion of the sentencing authority. See Maynard v. Cartwright, 486 U.S. 356, 362, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court's post-Furman cases make it clear that to survive Eighth Amendment scrutiny, a factor used as an aggravating circumstance in a capital punishment statute must provide a `principled way to distinguish' cases in which the death penalty is appropriate from cases in which it is not. See, e.g., Godfrey v. Georgia, 446 U.S. 420, 433, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). The Supreme Court has held that the `especially heinous, atrocious, or cruel' aggravating circumstance provides such a principled distinction only where the state appellate courts employ a consistent and narrow interpretation of that circumstance to channel the discretion of the sentencer. See Cartwright, 486 U.S. at 365-66, 108 S.Ct. 1853, 100 L.Ed.2d 372 (upholding the Oklahoma Court of Criminal Appeals' interpretation of the `especially heinous, atrocious, or cruel' aggravating circumstance to require, before a death sentence is imposed, a finding that the victim was tortured or was caused to suffer serious physical abuse).
"In Lindsey v. Thigpen, 875 F.2d 1509 (11th Cir.1989), the United States Court of Appeals for the Eleventh Circuit upheld this Court's application of the `especially heinous, atrocious or cruel' aggravating circumstance because this Court's application of it provided a `principled way to distinguish' cases in which the death penalty is appropriately imposed from cases in which it is not. Id. at 1513, 1515 (upholding our application of Ala.Code 1975, § 13A-5-49(8) and quoting Godfrey, 446 U.S. at 431, 100 S.Ct. *646 1759, 64 L.Ed.2d 398). The Eleventh Circuit emphasized that the Alabama appellate courts' interpretation of § 13A-5-49(8) passed muster under the Eighth Amendment because this Court and the Court of Criminal Appeals had consistently defined `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim.' Lindsey v. Thigpen, at 1514 (quoting Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981))...."
Ex parte Clark, 728 So.2d 1126, 1137-38 (Ala.1998), on remand, 728 So.2d 1141 (Ala.Crim.App.1998)(footnotes omitted; emphasis on "unnecessarily torturous" in original; other emphasis added). "This Court has approved the application of [the especially heinous, atrocious, or cruel] aggravating circumstance when the testimony established that the victims were stabbed multiple times and that they had suffered before their deaths." Duke v. State, 889 So.2d 1, 36 (Ala.Crim.App.2002). See, e.g., Waldrop v. State, 859 So.2d 1138 (Ala.Crim.App.2000)(opinion on return to remand), aff'd, 859 So.2d 1181 (Ala.2002)(where the evidence indicated that the victims had been repeatedly stabbed with a knife and that one victim had witnessed the attack on the other, the offense was especially heinous, atrocious, or cruel); Price v. State, 725 So.2d 1003 (Ala.Crim.App.1997), aff'd, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999)(where the evidence indicated that the victim had been repeatedly stabbed with a knife and had witnessed an attack on his spouse, the offense was especially heinous, atrocious, or cruel); Barbour v. State, 673 So.2d 461 (Ala.Crim.App.1994), aff'd, 673 So.2d 473 (Ala.1995), cert. denied, 518 U.S. 1020, 116 S.Ct. 2556, 135 L.Ed.2d 1074 (1996)(where the evidence indicated that the victim moaned after she had been stabbed and that she had suffered before her death, the offense was especially heinous, atrocious, or cruel); and Ashley v. State, 651 So.2d 1096 (Ala.Crim.App.1994)(where the evidence indicated that the victim had been stabbed in the chest as he slept and had been stabbed in the back as he jumped out of bed, the offense was especially heinous, atrocious, or cruel).
In its sentencing order, the trial court stated the following in finding that the murder in this case was especially heinous, atrocious, or cruel:
"The second aggravating circumstance which the court finds to be present in this case is that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. The court finds that the appellate courts of this state have stated, and the court also believes it to be true, that every capital offense is heinous, atrocious, and/or cruel. The court is in a better position than the jury to compare the facts of this case with the facts of other capital cases. This case is one of those cases that fits into the category of especially heinous, atrocious, or cruel compared to other capital offenses. The court makes this finding, in part, based upon the evidence of the status and person of the victim, the fact that William `Manzy' Ewing, the victim in this case, was handicapped, physically and mentally, and further that the defendant knew the victim and the condition of the victim prior to the commission of the offense. It is the actions of the defendant that make this case particularly heinous, atrocious, and cruel. The defendant knew his victim, knew that he was mentally and physically handicapped, chose him as his victim and used far more force, specifically deadly force than was necessary for him to accomplish the robbery he committed and than was necessary to cause the death of the victim.

*647 "Additionally, the appellate courts of this state have indicated that in determining whether a capital offense is especially heinous, atrocious, or cruel, the court must look to the suffering or injury of the victim while the victim was still alive. In this particular case, according to the testimony of the State Medical Examiner, Dr. Leroy Riddick, Mr. Ewing probably lived for several minutes after the death-producing stab which pierced his heart. He may have suffered for several minutes after the commencement of the injurious blows and before the death-causing blow was delivered in the incident in question. The court finds from the evidence, particularly the medical evidence and the evidence presented by the Department of Forensic Sciences, that Manzy Ewing suffered numerous injuries, perhaps more than 32 stabbing blows and great pain and remained alive suffering that pain for an extended period of time. It is clear from the evidence that Mr. Ewing sought to escape the knife blows and essentially `fought for his life,' not in a physically aggressive way, but in a defensive retreating way. It is impossible to imagine the mental anguish and suffering he experienced as he sought to save his own life."
The trial court's findings are supported by the evidence. Dr. Leroy Riddick, the medical examiner who performed the autopsy on Ewing, testified that Ewing had 15 stab wounds, 17 superficial cuts, and several scrapes on his body, including his back, his chest, his face, his arms, and his hands. According to Dr. Riddick, the presence and amount of blood in each wound indicated that Ewing was alive when each wound was inflicted; however, he said that he could not determine the order in which the wounds were inflicted. Dr. Riddick stated that the two stab wounds in Ewing's back were relatively deep wounds and that one of the stab wounds to the chest punctured Ewing's heart. Dr. Riddick testified that the wound to the heart would have been fatal within a few minutes. Dr. Riddick also stated that there were a few wounds on Ewing's hands and arms which he described as defensive wounds; however, Dr. Riddick stated that the lack of a significant number of defensive wounds on Ewing's hands and arms indicated that Ewing and the perpetrator were in very close proximity, i.e., closer than two feet, struggling at the time of the stabbing. Clark stated in his statement to the police that he and Ewing were struggling during the stabbing and that Ewing was still alive and trying to open the door to the store when he left the scene. In addition, James Iles testified that, when he drove by Ewing's store, he saw two people outside  one walking toward a car parked at the gas pumps and one on his hands and knees in the parking lot.
As the trial court found, this evidence establishes that Ewing was savagely attacked with a knife, suffering a level of physical violence far beyond that necessary or sufficient to cause death; that he was alive during the entirety of the attack (and, in fact, after the attack had ended) and that he fought for his life; and that he suffered great pain, both physically and psychologically. Although the evidence is inconclusive as to the exact sequence in which the wounds were inflicted on Ewing and as to the exact length of time that Ewing may have lived following the attack, the evidence of the struggle itself, in conjunction with Dr. Riddick's testimony that Ewing could have lived for several minutes after the stab to the heart that killed him, Clark's own statement to the police that Ewing was, in fact, alive and moving when he left the scene, and the testimony of the eyewitness who saw a person on his hands and knees in the parking lot of Ewing's store as Clark was leaving, all suggest that *648 the period of fear and suffering that Ewing experienced was "prolonged enough to separate the crime from `ordinary' murders for which the death penalty is not appropriate." Norris v. State, 793 So.2d 847, 861 (Ala.Crim.App.1999)(providing a good discussion of several generally recognized factors to be considered in determining whether this aggravating circumstance has been proven beyond a reasonable doubt). The evidence supports the trial court's finding that this crime was especially heinous, atrocious, or cruel.
Moreover, contrary to Clark's contention, the trial court's statement that its finding that the murder was especially heinous, atrocious, or cruel was based, at least in part, on the fact that Ewing was mentally and physically handicapped and that Clark knew that when he killed Ewing does not result in "a new expansion to the [heinous, atrocious, or cruel] criteria." (Clark's appellate brief at p. 75.) In the original opinion remanding this case, this Court stated:
"We are concerned that the trial court's basing the finding [of the aggravating circumstance that the murder was especially heinous, atrocious, or cruel] in part on the `status and person of the victim' and not solely on the circumstances of the murder may exceed the narrow interpretation of this aggravating circumstance that was adopted in Ex parte Kyzer, 399 So.2d 330, 334 (Ala.1981), and that its judgment would not withstand the years of appellate review given a case in which the sentence is death. We do not mean to be understood as saying that the trial court's finding that the offense was especially heinous, atrocious, or cruel as compared to other capital offenses cannot be supported by the record. However, as we stated in Norris [v. State, 793 So.2d 847, 861 (Ala.Crim.App.1999)], `it is imperative that we continue to use a "consistent and narrow interpretation" of this aggravating circumstance' in order to maintain the constitutionality of its application. 793 So.2d at 853. See also Ex parte Clark, 728 So.2d 1126 (Ala.1998). Therefore, we direct the trial court to consider only the narrow interpretation defining `especially heinous, atrocious or cruel' to include only `those conscienceless or pitiless homicides which are unnecessarily torturous to the victim' as mandated by Ex parte Kyzer, when determining the existence or nonexistence of this aggravating circumstance."
Clark v. State, 896 So.2d 584, 596 (Ala.Crim.App.2000).
Because it was necessary to remand this case for correction of several deficiencies in the trial court's sentencing order, this Court, out of an abundance of caution, wanted to ensure that the trial court was aware of the narrow interpretation of the especially heinous, atrocious, or cruel aggravating circumstance that is required to maintain its constitutionality. In that vein, this Court instructed the trial court to reconsider this aggravating circumstance under the well-established interpretation set out in Ex parte Kyzer, 399 So.2d 330 (Ala.1981). In its amended order, the trial court expanded its factual findings regarding this aggravating circumstance, but it kept in the order its reference to the status of the victim and its reference to Clark's knowledge of that status. We do not believe the trial court's consideration of the status and person of the victim in determining that the crime was especially heinous, atrocious, or cruel constitutes error in this case.
As noted above, only if the crime is conscienceless or pitiless and unnecessarily torturous to the victim can it be considered especially heinous, atrocious, or cruel. Obviously, the status of the victim *649 is of no consequence in determining whether the crime was unnecessarily torturous to the victim. However, it is relevant and probative of whether the crime was conscienceless or pitiless. The fact that Ewing was mentally and physically handicapped and that Clark knew this when he went into the store and used force well beyond that necessary to kill Ewing suggests that Ewing's handicap may have actually played a part in Clark's choosing Ewing as his victim. The trial court's consideration of this fact, therefore, did not improperly expand the scope of the especially heinous, atrocious, or cruel aggravating circumstance beyond those conscienceless or pitiless crimes that are unnecessarily torturous to the victims. To the contrary, it is clear from the sentencing order that the trial court's finding that this crime was especially heinous, atrocious, or cruel was based solely on a finding that the crime was conscienceless or pitiless and unnecessarily torturous to Ewing,[17] and that Ewing's mental and physical handicap was but one circumstance the trial court considered in making that determination.
Although we find no error in the trial court's consideration in this particular case of the victim's mental and physical handicap in determining that the crime was especially heinous, atrocious, or cruel, we caution trial courts that the status of the victim cannot by itself establish that a crime was especially heinous, atrocious, or cruel and that consideration of the status of the victim will not be appropriate in all cases. It is only in this case, based on the facts, that we find that consideration of the victim's physical and mental handicap was appropriate in determining that the crime was especially heinous, atrocious, or cruel.[18]
We find no error on the part of the trial court in finding that this crime was especially heinous, atrocious, or cruel.

XIII.
Clark contends that the trial court improperly refused to consider several statutory and nonstatutory mitigating circumstances that, he says, exist in this case. (Issue IV in Clark's appellate brief.) Specifically, Clark maintains that the trial court refused to consider the following statutory and nonstatutory mitigating circumstances: (1) that he was unable to appreciate the criminality of his conduct or to conform his conduct to the law due to his cocaine addiction; (2) that, at the time of the crime, he was acting under an extreme mental or emotional disturbance due to his cocaine addiction and his lack of sleep the night before the murder; (3) that he did not have a significant history of prior criminal activity; (4) that he expressed remorse for the crime; (5) that he had not slept the night before the murder; (6) that he had a long-term addiction to illegal narcotics beginning when he was 15 *650 or 16 years old; (7) that one of the jurors recommended a sentence of life without the possibility of parole; (8) that there was a history of substance abuse in his family; (9) that he has "a positive family relationship" with his ex-wife, his children, his grandchildren, and his parents; (10) that there is a possibility that he could be rehabilitated; (11) that he was a hard worker, working for over 30 years, despite his substance-abuse problems; (12) that he cooperated with law enforcement; (13) that his behavior while in jail awaiting trial was generally good, despite some "minor incidents"; and (14) mercy. (Clark's appellate brief at pp. 78-89.) Although, in his motion for a new trial, Clark generally argued that the trial court had "improperly failed to consider mitigating circumstances" (C. 169), he did not present the trial court with the specific claim he now raises on appeal; therefore, we review the claim under the plain-error rule. See Rule 45A, Ala.R.App.P.
"`In Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Supreme Court held that a death penalty statute cannot constitutionally preclude consideration of relevant mitigating factors. However, Lockett does not require that all evidence offered as mitigating evidence be found to be mitigating. Lockett provides that a state may not exclude evidence that the defendant claims is mitigating. This does not mean that all evidence offered by the defendant as mitigating must be found to be mitigating and considered as such in the sentencing process.'
"Ex parte Hart, 612 So.2d 536, 542 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993).' "While Lockett and its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."' Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997), quoting Bankhead v. State, 585 So.2d 97, 108 (Ala.Crim.App.1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd on return to remand, 625 So.2d 1141 (Ala.Crim.App.1992), rev'd, 625 So.2d 1146 (Ala.1993). `Merely because an accused proffers evidence of a mitigating circumstance does not require the judge or the jury to find the existence of that fact.' Harrell v. State, 470 So.2d 1303, 1308 (Ala.Crim.App.1984), aff'd, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
"`"A sentencer in a capital case may not refuse to consider or be `precluded from considering' mitigating factors. Eddings v. Oklahoma, 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1 (1982) (quoting Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978)). The defendant in a capital case generally must be allowed to introduce any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Ex parte Henderson, 616 So.2d 348 (Ala.1992); Haney v. State, 603 So.2d 368 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993). Although the trial court is required to consider all mitigating circumstances, the decision of whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. Carroll v. State, 599 So.2d 1253 (Ala.Cr.App.1992), aff'd, *651 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). See also Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence offered that it considered and found not to be mitigating. Morrison v. State, 500 So.2d 36 (Ala.Cr.App.1985), aff'd, 500 So.2d 57 (Ala.1986), cert. denied, 481 U.S. 1007, 107 S.Ct. 1634, 95 L.Ed.2d 207 (1987)."'
"Wilson v. State, 777 So.2d 856, 892 (Ala.Crim.App.1999), quoting Williams v. State, 710 So.2d 1276, 1347 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). The fact that the trial court does not list and make findings in its sentencing order as to each alleged nonstatutory mitigating circumstance offered by a defendant indicates that the trial court found some of the offered evidence not to be mitigating, not that the trial court did not consider this evidence. See, e.g., Ingram v. State, 779 So.2d 1225 (Ala.Crim.App.1999)."
Reeves v. State, 807 So.2d 18, 47-48 (Ala.Crim.App.2000), cert. denied, 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001).
In its amended sentencing order submitted on return to remand, the trial court made the following findings regarding mitigating circumstances:
"Now, turning to the mitigating circumstances enumerated by statute, the court notes for the record that the court, just as the jury, is entitled to consider any mitigating circumstance which it finds but is specifically required to look particularly at the mitigating circumstances enumerated by statute. The court is going to address each of the statutorily enumerated mitigating circumstances. The court wants to be sure that the record is clear that a non-finding or finding of a negative is not considered as an aggravating circumstance and is not considered against the defendant, but the court makes these findings simply so that the record will be clear that the court has considered each possible mitigating circumstance and finds that it does not exist in this case.
"In particular with regard to the first enumerated mitigating circumstance, the court does not find that the defendant has no significant history of prior criminal activity. Instead, the court finds that the defendant has a very significant history of prior criminal activity. He was convicted of possession of a controlled substance for which he was sentenced to five (5) years in the penitentiary. He served a portion of the sentence and was thereafter paroled.
"The second mitigating circumstance is that the defendant acted under extreme duress or under substantial dominance of another person.[[19]] The court does not find that this mitigating circumstance exists based upon the evidence presented in this case.
"The third mitigating circumstance is that the victim was a participant in the defendant's conduct or consented to it. The court again does not find that this *652 mitigating circumstance exists based upon the evidence presented in this case.
"The next mitigating circumstance [is] that the defendant was an accomplice in the capital offense committed by another person and that the participation was relatively minor. The defendant was the sole participant in this capital crime, therefore, the court finds that this mitigating circumstance does not exist in this case.
"The next mitigating circumstance is that the defendant acted under extreme duress or under the substantial domination of another person. This court finds that this mitigating circumstance does not exist in this case.
"The next mitigating circumstance is that the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. There has been certain evidence presented at trial concerning drug abuse by the defendant and there was evidence of drug abuse or being under the influence of crack cocaine the night before or during the earlier morning hours of the day in question, but the court finds based on the totality of the evidence that the defendant was not under the influence of alcohol or a controlled substance at the time of this offense and there was no reduction in the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.
"The last mitigating circumstance enumerated in the statute is the age of the defendant. The defendant was forty (40) years old on the date of the commission of the crime. In fact, February 14, 1998, was the defendant's 40th birthday. The court finds that this mitigating circumstance does not exist in this case.
"....
"Just as the jury was required to consider, the Court is likewise required to consider that requirement of Section 13A-5-52: In addition to the mitigating circumstances specified in section 13A-5-51, mitigating circumstances shall include any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant offers as a basis for a sentence of life imprisonment without parole instead of death and any other relevant mitigating circumstance which the defendant offers as a basis for a sentence of life imprisonment without parole instead of death.
"The court finds from the evidence that substantial evidence was presented at trial of the defendant's long history of substance abuse; however, the court has previously found that this was not sufficient for a finding that the defendant committed this offense while under the influence of extreme mental or emotional disturbance or sufficient to substantially impair his appreciation [of] the wrongfulness of his actions or to conform his actions to the requirements of law.
"The court finds based upon the evidence presented in all three phases of this trial, as well as that evidence presented in the presentence investigation, that there is no mitigating circumstance in this case."
(Emphasis added.)
The sentencing order shows that the trial court considered all of the mitigating evidence offered by Clark. The trial court did not limit or restrict Clark in any way as to the evidence he presented or the arguments he made regarding mitigating circumstances. In its sentencing order, the trial court addressed each statutory mitigating circumstance listed in § 13A-5-51, Ala.Code 1975, and it determined that none of those circumstances existed under *653 the evidence presented. Although the trial court did not list and make findings as to the existence or nonexistence of each nonstatutory mitigating circumstance offered by Clark, as noted above, such a listing is not required, and the trial court's not making such findings indicates only that the trial court found the offered evidence not to be mitigating, not that the trial court did not consider this evidence. Clearly, the trial court considered Clark's proffered evidence of mitigation but concluded that the evidence did not rise to the level of a mitigating circumstance. The trial court's findings in this regard are supported by the record.
Because it is clear from a review of the entire record that the trial court understood its duty to consider all the mitigating evidence presented by Clark, that the trial court did in fact consider all such evidence, and that the trial court's findings are supported by the evidence, we find no error, plain or otherwise, in the trial court's findings regarding the statutory and nonstatutory mitigating circumstances.

XIV.
On June 24, 2002, the United States Supreme Court issued its decision Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We subsequently directed the parties to file supplemental briefs in this case addressing the impact of Ring on Clark's sentence of death. In his supplemental brief, Clark makes several arguments regarding the impact of Ring, which, he says, "invalidates Alabama's death penalty scheme [on] several grounds." (Clark's supplemental brief at p. 2.) After the parties filed their supplemental briefs, the Alabama Supreme Court issued its decision in Ex parte Waldrop, 859 So.2d 1181 (Ala.2002), a case materially indistinguishable from the present case. In addition, this Court has issued three opinions addressing various claims with respect to Ring. See Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2003)(opinion on return to second remand); Turner v. State, [Ms. CR-99-1568, November 22, 2002] ___ So.2d ___ (Ala.Crim.App.2002); and Tomlin v. State, [Ms. CR-98-2126, November 22, 2002] ___ So.2d ___, ___ (Ala.Crim.App.2002)(opinion on rehearing). All of Clark's arguments with respect to Ring have been addressed and decided adversely to him either by this Court or by the Alabama Supreme Court.
In Ex parte Waldrop, the appellant was convicted of two counts of murder made capital because the murders were committed during the course of a robbery and one count of murder made capital because two or more persons were murdered by one act or pursuant to one scheme or course of conduct. The jury recommended, by a vote of 10-2, that the appellant be sentenced to life imprisonment without the possibility of parole. The trial court overrode the jury's recommendation and sentenced the appellant to death, finding the existence of two aggravating circumstances  that the murders were committed during the course of a robbery and that the murders were especially heinous, atrocious, or cruel.
In addressing the impact of Ring on the appellant's sentence of death, the Alabama Supreme Court stated:
"In Apprendi [v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)], the Supreme Court held that `[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.' Apprendi, 530 U.S. at 490, 120 S.Ct. 2348. In Ring v. Arizona, [536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002),] the Supreme Court tested *654 this principle against Arizona's death-penalty scheme.
"....
"The Supreme Court ... overruled Walton v. Arizona, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), in which it had previously upheld Arizona's sentencing scheme, `to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Furthermore, `[b]ecause Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense,"' the Sixth Amendment required those factors to be found by a jury. Id. (quoting Apprendi, 530 U.S. at 494 n. 19, 120 S.Ct. 2348). Because the trial judge, and not the jury, undertook the `factfinding necessary' to put Ring to death, the Supreme Court reversed the judgment of the Arizona Supreme Court. Id.

"....
"It is true that under Alabama law at least one statutory aggravating circumstance under Ala.Code 1975, § 13A-4-49, must exist in order for a defendant convicted of a capital offense to be sentenced to death. See Ala.Code 1975, § 13A-5-45(f)(`Unless at least one aggravating circumstance as defined in Section 13A-5-49 exists, the sentence shall be life imprisonment without parole.'); Johnson v. State, 823 So.2d 1, 52 (Ala.Crim.App.2001)(holding that in order to sentence a capital defendant to death, the sentencer ' "must determine the existence of at least one of the aggravating circumstances listed in [Ala.Code 1975,] § 13A-5-49"' (quoting Ex parte Woodard, 631 So.2d 1065, 1070 (Ala.Crim.App.1993))). Many capital offenses listed in Ala.Code 1975, § 13A-5-40, include conduct that clearly corresponds to certain aggravating circumstances found in § 13A-5-49:
"`For example, the capital offenses of intentional murder during a rape, § 13A-5-40(a)(3), intentional murder during a robbery, § 13A-5-40(a)(2), intentional murder during a burglary, § 13A-5-40(a)(4), and intentional murder during a kidnapping, § 13A-5-40(a)(1), parallel the aggravating circumstance that "[t]he capital offense was committed while the defendant was engaged ... [in a] rape, robbery, burglary or kidnapping," § 13A-5-49(4).'
"Ex parte Woodard, 631 So.2d at 1070-71 (alterations and omission in original).
"Furthermore, when a defendant is found guilty of a capital offense, `any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentencing hearing.' Ala.Code 1975, § 13A-5-45(e); see also Ala.Code 1975, § 13A-5-50 (`The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence.'). This is known as `double-counting' or `overlap,' and Alabama courts `have repeatedly upheld death sentences where the only aggravating circumstance supporting the death sentence overlaps with an element of the capital offense.' Ex parte Trawick, 698 So.2d 162, 178 (Ala.1997); see also Coral v. State, 628 So.2d 954, 965 (Ala.Crim.App.1992).
"Because the jury convicted Waldrop of two counts of murder during a robbery *655 in the first degree, a violation of Ala.Code 1975, § 13A-5-40(a)(2), the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala.Code 1975, § 13A-5-49(4), was `proven beyond a reasonable doubt.' Ala.Code 1975, § 13A-5-45(e); Ala.Code 1975, § 13A-5-50. Only one aggravating circumstance must exist in order to impose a sentence of death. Ala.Code 1975, § 13A-5-45(f). Thus, in Waldrop's case, the jury, and not the trial judge, determined the existence of the `aggravating circumstance necessary for imposition of the death penalty.' Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Therefore, the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty. This is all Ring and Apprendi require.
"....
"Waldrop also claims that Ring and Apprendi require that the jury, and not the trial court, determine whether the aggravating circumstances outweigh the mitigating circumstances....
"Contrary to Waldrop's argument, the weighing process is not a factual determination. In fact, the relative `weight' of aggravating circumstances and mitigating circumstances is not susceptible to any quantum of proof. As the United States Court of Appeals for the Eleventh Circuit noted, `While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard ... the relative weight is not.' Ford v. Strickland, 696 F.2d 804, 818 (11th Cir.1983). This is because weighing the aggravating circumstances and the mitigating circumstances is a process in which `the sentencer determines whether a defendant eligible for the death penalty should in fact receive that sentence.' Tuilaepa v. California, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). Moreover, the Supreme Court has held that the sentencer in a capital case need not even be instructed as to how to weigh particular facts when making a sentencing decision. See Harris v. Alabama, 513 U.S. 504, 512, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995)(rejecting `the notion that "a specific method for balancing mitigating and aggravating factors in a capital sentencing proceeding is constitutionally required"' (quoting Franklin v. Lynaugh, 487 U.S. 164, 179, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988)) and holding that `the Constitution does not require a State to ascribe any specific weight to particular factors, either in aggravation or mitigation, to be considered by the sentencer').
"Thus, the weighing process is not a factual determination or an element of an offense; instead, it is a moral or legal judgment that takes into account a theoretically limitless set of facts and that cannot be reduced to a scientific formula or the discovery of a discrete, observable datum. See California v. Ramos, 463 U.S. 992, 1008, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983)(`Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.'); Zant v. Stephens, 462 U.S. 862, 902, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983) (Rehnquist, J., concurring in the judgment) (`sentencing decisions rest on a far-reaching inquiry into countless facts and circumstances and not on the type of proof of particular elements that returning a conviction does').
"In Ford v. Strickland, supra, the defendant claimed that `the crime of capital murder in Florida includes the element *656 of mitigating circumstances not outweighing aggravating circumstances and that the capital sentencing proceeding in Florida involves new findings of fact significantly affecting punishment.' Ford, 696 F.2d at 817. The United States Court of Appeals for the Eleventh Circuit rejected this argument, holding that `aggravating and mitigating circumstances are not facts or elements of the crime. Rather, they channel and restrict the sentencer's discretion in a structured way after guilt has been fixed.' 696 F.2d at 818. Furthermore, in addressing the defendant's claim that the State must prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating circumstances, the court stated that the defendant's argument
"`seriously confuses proof of facts and the weighing of facts in sentencing. While the existence of an aggravating or mitigating circumstance is a fact susceptible to proof under a reasonable doubt or preponderance standard, see State v. Dixon, 283 So.2d 1, 9 (Fla.1973), cert. denied, 416 U.S. 943, 94 S.Ct. [1950], 40 L.Ed.2d 295 (1974), and State v. Johnson, 298 N.C. 47, 257 S.E.2d 597, 617-18 (1979), the relative weight is not. The process of weighing circumstances is a matter for judge and jury, and, unlike facts, is not susceptible to proof by either party.'
"696 F.2d at 818. Alabama courts have adopted the Eleventh Circuit's rationale. See Lawhorn v. State, 581 So.2d 1159, 1171 (Ala.Crim.App.1990) (`while the existence of an aggravating or mitigating circumstance is a fact susceptible to proof, the relative weight of each is not; the process of weighing, unlike facts, is not susceptible to proof by either party'); see also Melson v. State, 775 So.2d 857, 900-901 (Ala.Crim.App.1999); Morrison v. State, 500 So.2d 36, 45 (Ala.Crim.App.1985).
"Thus, the determination whether the aggravating circumstances outweigh the mitigating circumstances is not a finding of fact or an element of the offense. Consequently, Ring and Apprendi do not require that a jury weigh the aggravating circumstances and the mitigating circumstances.
"....
"Waldrop claims that the trial court's determination that the murders were especially heinous, atrocious, or cruel as compared to other capital offenses  an aggravating circumstance under Ala.Code 1975, § 13A-5-49(8)  is a factual determination that under Ring must be made by the jury. However, Ring and Apprendi do not require that the jury make every factual determination; instead, those cases require the jury to find beyond a reasonable doubt only those facts that result in `an increase in a defendant's authorized punishment ...' or '"expose[ ] [a defendant] to a greater punishment...."' Ring, 536 U.S. at 602, 122 S.Ct. at 2439, 2440 (quoting Apprendi, 530 U.S. at 494, 120 S.Ct. 2348). Alabama law requires the existence of only one aggravating circumstance in order for a defendant to be sentenced to death. Ala.Code 1975, § 13A-5-45(f). The jury in this case found the existence of that one aggravating circumstance: that the murders were committed while Waldrop was engaged in the commission of a robbery. At that point, Waldrop became `exposed' to, or eligible for, the death penalty. The trial court's subsequent determination that the murders were especially heinous, atrocious, or cruel is a factor that has application only in weighing the mitigating circumstances and the aggravating circumstances, a process that we *657 held earlier is not an `element' of the offense."
859 So.2d at 1186-1190 (footnotes omitted). Furthermore, this Court has specifically held that "the Supreme Court's decision in Ring did not invalidate Alabama's law that vests the ultimate sentence determination in the hands of the trial judge and not a jury." Turner, supra at ___. See also Tomlin, supra at ___ ("The United States Supreme Court in Ring did not invalidate its earlier holding in Harris v. Alabama, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995), which upheld § 13A-5-47(e), Ala.Code 1975  commonly referred to as the judicial override statute  against constitutional attack."). In addition, we have said that aggravating circumstances do not have to be charged in the indictment. See Stallworth, supra.
In this case, as in Ex parte Waldrop, the existence of the aggravating circumstance that the capital offense was committed while engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975, was proven beyond a reasonable doubt by virtue of the jury's guilt-phase verdict finding Clark guilty of capital murder during a robbery. Because only one aggravating circumstance must exist in order to impose a sentence of death, the jury's guilt-phase verdict alone exposed Clark to a range of punishment that had as its maximum the death penalty. Clearly then, it was the jury (at the guilt phase), not the trial court, that determined the existence of the "aggravating circumstance necessary for imposition of the death penalty." Ring, 536 U.S. at 609, 122 S.Ct. at 2443. Because the maximum sentence Clark could receive based on the jury's guilt-phase verdict alone was death, the trial court's finding of the additional aggravating circumstance that the murder was especially heinous, atrocious, or cruel was a factor that had application only in the process of weighing the aggravating and the mitigating circumstances, a process that is not a factual finding within the purview of Ring and Apprendi. Moreover, contrary to Clark's contention, the decision in Ring does not invalidate Alabama's scheme of vesting the ultimate sentencing authority in the trial court, with the jury relegated to an advisory role, and it does not require all of the aggravating circumstances relied on by the State to be charged in the indictment. The procedure by which Clark was sentenced to death fully complied with the United States Supreme Court's decision in Ring and, thus, Clark's sentence of death is proper.

XV.
Finally, Clark reminds this Court of its responsibility under § 13A-5-53, Ala.Code 1975, in reviewing cases where the death penalty has been imposed. (Issue XIV in Clark's appellate brief.) In so doing, Clark argues that death is not the appropriate sentence in his case, and he urges this Court to set aside the sentence because, he says, the aggravating circumstances do not outweigh the mitigating circumstances. In support of this argument, Clark asks this Court to consider a litany of mitigating circumstances that the trial court found not to exist. (See Part XIII of this opinion.) However, as this Court stated in Roberts v. State, 735 So.2d 1244 (Ala.Crim.App.1997):
"In capital cases, it is the duty of this court to independently determine whether the sentence of death is appropriate in a particular case. In order to reach this conclusion, we must reweigh the aggravating circumstances and the mitigating circumstances as found by the trial court."
735 So.2d at 1269 (emphasis added). See also Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), aff'd, 689 So.2d 951 (Ala.), cert. denied, 522 U.S. 848, 118 S.Ct. 135, 139 L.Ed.2d 84 (1997). This Court cannot, as Clark urges us to do, consider mitigating *658 circumstances not found to exist by the trial court.

XVI.
In accordance with Rule 45A, Ala.R.App.P., we have examined the record for any plain error with respect to Clark's capital-murder conviction, whether or not brought to our attention or to the attention of the trial court. We find no plain error or defect in the proceedings during the guilt phase of the trial.
We have also reviewed Clark's sentence in accordance with § 13A-5-53, Ala.Code 1975, which requires that, in addition to reviewing the case for any error involving Clark's capital-murder conviction, we shall also review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting the rights of the defendant occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is the proper sentence, we must determine: (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this Court of the aggravating and mitigating circumstances indicates that death is the proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.
After the jury convicted Clark of the capital offense charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. After hearing evidence concerning the aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of an advisory verdict, the jury recommended a sentence of death by a vote of 11-1.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Clark to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). In its amended sentencing order, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, as well as written findings of fact summarizing the offense and Clark's participation in it. The trial court also stated that it had considered the mitigating evidence offered by Clark pursuant § 13A-5-52, Ala.Code 1975, and that it found no nonstatutory mitigating circumstances to exist.
In its findings, the trial court found the existence of two statutory aggravating circumstances: (1) that the murder was committed during the course of a robbery in the first degree, see § 13A-5-49(4), Ala.Code 1975, and (2) that the murder was especially heinous, atrocious, or cruel compared to other capital offenses, see § 13A-5-49(8), Ala.Code 1975. The trial court found no statutory or nonstatutory mitigating circumstances to exist under §§ 13A-5-51 and -52, Ala.Code 1975. The trial court's sentencing order reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of *659 the jury, and after weighing the aggravating circumstances against the absence of any mitigating circumstances, the trial court found that the aggravating circumstances outweighed the nonexistent mitigating circumstances. Accordingly, the trial court sentenced Clark to death. The trial court's findings concerning the aggravating circumstances and the mitigating circumstances are supported by the evidence, and we find no plain error or defect in the sentencing phase of the proceedings.[20]
Clark was convicted of the offense of murder committed during the course of a robbery. This offense is defined by statute as a capital offense. See § 13A-5-40(a)(2), Ala.Code 1975. We take judicial notice that similar crimes have been punished capitally throughout the state. See, e.g., Jackson v. State, 791 So.2d 979 (Ala.Crim.App.), cert. denied, 791 So.2d 1043 (Ala.2000), cert. denied, 532 U.S. 934, 121 S.Ct. 1387, 149 L.Ed.2d 311 (2001); Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000), cert. denied 534 U.S. 1026, 122 S.Ct. 558, 151 L.Ed.2d 433 (2001); West v. State, 793 So.2d 870 (Ala.Crim.App.2000), cert. denied, 534 U.S. 849, 122 S.Ct. 116, 151 L.Ed.2d 72 (2001); Hardy v. State, 804 So.2d 247 (Ala.Crim.App.1999), aff'd, 804 So.2d 298 (Ala.2000), cert. denied, 534 U.S. 1043, 122 S.Ct. 621, 151 L.Ed.2d 543 (2001); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998); McNair v. State, 706 So.2d 828 (Ala.Crim.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Henderson v. State, 583 So.2d 276 (Ala.Crim.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala.Crim.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Crim.App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Crim.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); and Cochran v. State, 500 So.2d 1161, (Ala.Crim.App.1984), aff'd in part, rev'd in part, 500 So.2d 1179 (Ala.1985), aff'd on return to remand, 500 So.2d 1188 (Ala.Crim.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
After carefully reviewing the record of the guilt phase and of the sentencing phase of Clark's trial, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other *660 arbitrary factor. The findings and conclusions of the trial court are amply supported by the evidence. We have independently weighed the aggravating circumstances against the absence of any statutory or nonstatutory mitigating circumstances, and we concur in the trial court's judgment that the aggravating circumstances outweigh the nonexistent mitigating circumstances, and we agree that death is the appropriate sentence in this case. Considering the crime committed, and Clark, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases.
Clark's conviction and his sentence of death are affirmed.
OPINION OF FEBRUARY 28, 2003, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING OVERRULED; AFFIRMED.
McMILLAN, P.J., and COBB and WISE, JJ., concur. BASCHAB, J., recuses herself.
NOTES
[1] This case was originally assigned to another judge on this Court. It was reassigned to Judge Shaw on return to remand. Although Judge Shaw was not a member of this Court when this case was orally argued, he has listened to the audiotape of the oral argument.
[2] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[3] Clark said that he had the knife in his jacket pocket because, when he had run out of gas the previous evening, he had been in a bad neighborhood, so he took the knife out of the glove compartment of his stepfather's truck and carried it with him as he walked to Kenny's apartment. According to Clark, he left the sheath for the knife in the glove compartment of the truck.
[4] According to Jones, the reason the blood on Clark's hand contained his own DNA was because it is next to impossible to swab blood off of human tissue and not get some DNA from the tissue as well as from the blood.
[5] The jury-strike list was not originally included in the record; it was provided to this Court pursuant to Clark's motion to supplement the record.
[6] This Court has been informed by the circuit court that, after a diligent search, the completed juror questionnaires cannot be located.
[7] At several points during voir dire examination of the 10 panels, prospective jurors answered questions, including questions involving the death penalty, without identifying themselves. In addition, as noted previously, the questionnaires completed by the prospective jurors are not available for this Court's review. It is only from individual voir dire of each prospective juror that we can determine which prospective jurors were opposed to the death penalty.
[8] When evidence of character is admissible, there are three methods of proving it: reputation, opinion, and specific instances of conduct. See Rule 405, Ala.R.Evid. Rule 404(b), deals solely with specific instances of conduct and does nothing more than "make[ ] a specific application of the general principle of Rule 404(a)," Advisory Committee's Notes to Rule 404; it "is simply part of [the] . . . broader principle precluding proof of a person's character in any form when offered to prove action in conformity therewith on a particular occasion." Charles W. Gamble, McElroy's Alabama Evidence, § 69.01(1) (5th ed.1996)(footnote omitted).
[9] Although under Rule 404(a) evidence of an accused's bad character is inadmissible unless the accused has placed his character in issue, Rule 404(b) permits evidence of an accused's prior bad acts at any time and regardless of whether the accused has placed his or her character in issue if it is offered for a purpose other than showing the accused's bad character. See Ex parte Harris, 828 So.2d 874, 876 n. 1 (Ala.2001), on remand to 828 So.2d 879 (Ala.Crim.App.2001)("For . . . purposes [of Rule 404(b) and Rule 609(b)], it would not be necessary that the defense first offered evidence of the accused's character.").
[10] The prosecutor also mentioned the pictures during closing argument at the penalty phase of the trial. Clark does not argue that this reference was error, and, we find, after reviewing the record, that it was not.
[11] The State did not introduce into evidence the documents from the divorce action, and those documents are not in the record before this Court.
[12] Clark only cites law that reiterates the general proposition that evidence of a defendant's character is inadmissible.
[13] In our original opinion, this Court referred only to a single prior felony conviction. However, the record reflects that Clark had two prior felony convictions.
[14] We note that the State argues that the miscellaneous issues should be "ignored" by this Court because, it says, Clark's argument with respect to those issues does not comply with Rule 28(a)(10), Ala.R.App.P. (State's appellate brief at p. 42.) In its brief, the State does not address the merits of any of those issues, even under the doctrine of plain error. However, "there can be no waiver of appellate review in a case in which the death penalty has been imposed." Nelson v. State, 681 So.2d 252, 256 (Ala.Crim.App.1995), aff'd, 681 So.2d 260 (Ala.1996). This Court cannot, and certainly will not, "ignore" any of the issues Clark raises.
[15] This quote is actually found in § 61.01(7) of McElroy's Alabama Evidence, not in § 273.02.
[16] Clark's argument is only two paragraphs long. He states only what he believes the law should be, and he provides a string cite to six cases. He makes no real argument as to why the law should be changed, and he does not address how the cases cited are applicable to this issue. (In fact, our review of those cases reveals that they are either inapplicable to this issue or do not support Clark's position.) Instead, Clark states: "This argument has already been briefed in great detail [in another case]. Therefore, to advance the interest of judicial economy, Greg Clark hereby incorporates all of the legal argument from that case." (Clark's appellate brief at pp. 131-32.) Although this Court can take judicial notice of its own records, see, e.g., Nettles v. State, 731 So.2d 626 (Ala.Crim.App.1998), we decline to do so in this case.
[17] Although the trial court did not specifically state in its sentencing order that the crime was "conscienceless or pitiless" and "unnecessarily torturous to the victim," such a finding is implicit in the order.
[18] We note that Clark also argues, in Issue IX in his brief, that the jury should have been instructed that it could not consider Ewing's physical and mental handicap in determining whether the crime was especially heinous, atrocious, or cruel. Because we have already determined that the status of the victim was, in this particular case, properly considered by the trial court in determining whether the crime was especially heinous, atrocious, or cruel, we also find that the jury could properly consider it. Therefore, no instruction on this was necessary. Moreover, our review of the trial court's instructions at the penalty phase of the trial reveals that the jury was thoroughly and properly instructed on the narrow interpretation of the especially heinous, atrocious, or cruel aggravating circumstance.
[19] The trial court's order lists the mitigating circumstances in the order they appear in § 13A-5-51, Ala.Code 1975. Although in this paragraph the trial court lists the mitigating circumstance "under extreme duress or under the substantial domination of another person" under § 13A-5-51(5), based on the entire order, we believe the trial court was actually referring to the mitigating circumstance of "extreme mental or emotional disturbance," which is, in fact, the second mitigating circumstance listed in § 13A-5-51.
[20] In light of the United States Supreme Court's opinion in Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002), as part of our plain-error review, we have searched the record to determine if there is any inference that Clark is mentally retarded. See Ex parte Perkins, 851 So.2d 453 (Ala.2002), and Stallworth v. State, 868 So.2d 1128 (Ala.Crim.App.2003)(opinion on return to second remand). We have found no indication in the record that Clark is mentally retarded, even under the broadest definition of mental retardation. Therefore, the imposition of the death sentence in this case is not unconstitutional. We also note that we have found no plain error in the penalty-phase instructions under the Alabama Supreme Court's opinion in Ex parte Bryant, [Ms. 1990901, June 21, 2002] ___ So.2d ___ (Ala.2002). The instructions given in this case are materially identical to those approved by the Supreme Court in Ex parte Trawick, 698 So.2d 162 (Ala.1997). See McNabb v. State, 887 So.2d 929 (Ala.Crim.App.2003)(opinion on rehearing).